```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
                WICHITA FALLS DIVISION
```

VICTORIA KLEIN, et al.,           §
                                  §
            Plaintiffs,           §
                                  § Civil Action No. 7:03-CV-102-D
VS.                               §
                                  §
O'NEAL, INC., d/b/a O'NEAL,       §
JONES & FELDMAN                   §
PHARMACEUTICALS, et al.,          §
                                  §
            Defendants.           §

## MEMORANDUM OPINION AND ORDER

Plaintiffs Victoria Klein and Ashley Swadley, the class representatives of an opt-out class certified under Fed. R. Civ. P. 23(b)(3), move to modify the class certification order and convert the class to a non-opt-out class pursuant to Rule 23(b)(1)(B). Concluding that plaintiffs have failed to show that this case has the characteristics necessary for certification of a limited fund class action, the court denies the motion.

I

This products liability class action arises out of the manufacture and distribution of E-Ferol Aqueous Solution ("E-Ferol"), a pharmaceutical product administered intravenously to premature infants. Carter-Glogaur Laboratories, Inc., now known as Retrac, Inc.("Retrac"), a division of CVS Revco DS, Inc. ("CVS Revco") manufactured E-Ferol, and O'Neal, Jones and Feldman, now known as O'Neal, Inc. ("O'Neal") began distributing it in November 1983. E-Ferol was advertised and labeled as an intravenous Vitamin

E solution to be used to prevent retrolental fibroplasia, a condition that causes impaired vision or blindness in premature infants. No testing or research was done, however, to determine whether E-Ferol's formulation and recommended dosage would be safe and effective for use in premature infants.

Following reports of deaths and serious illnesses in infants and a request by the Food and Drug Administration ("FDA"), E-Ferol was recalled from the market in 1984. Approximately 1,000 infants had received E-Ferol. Both Retrac and O'Neal were subsequently convicted of multiple criminal counts of violating the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-99, including introducing into interstate commerce a new drug not approved by the FDA, with the intent to defraud or mislead. *See United States v. Hiland*, 909 F.2d 1114 (8th Cir. 1990). Approximately 150 lawsuits were thereafter filed against defendants, asserting claims arising out of the use of E-Ferol, all of which have been settled or dismissed.

In 2003 plaintiffs filed the instant action, alleging claims of negligence, breach of express and implied warranty, products liability, and misrepresentation, and seeking, *inter alia*, implementation of a medical monitoring program, damages, punitive damages, and attorney's fees and costs. They subsequently moved for class certification pursuant to Rule 23(b)(3), and in 2004 Judge Buchmeyer certified the following class:

> All persons in the United States, including any estate representatives or heirs of deceased persons, who, during the period from November 1, 1983 until April 30, 1984, were administered E-Ferol. Included in the class are parents, spouses, children, guardians, and legal representatives of such persons with direct or derivative claims.

*Klein v. O'Neal, Inc.*, No. 7:03-CV-102-R, slip op. at 1 (N.D. Tex. May 11, 2004) (Buchmeyer, J.). Defendants unsuccessfully sought leave to appeal the class certification order under Rule 23(f). The case was later transferred to the undersigned's docket, and plaintiffs now move to modify the class certification order.

II

"An order [certifying a class] may be altered or amended before final judgment." Rule 23(c)(1)(C); *see also* Rule 23(d) (giving court discretion to make appropriate orders in class actions). Rule 23(b)(1)(B) provides that, if the four threshold requirements——i.e., numerosity, commonality, typicality, and adequacy of representation——of Rule 23(a) that apply to all class actions are met, an action may be maintained as a class action if

> the prosecution of separate actions by or against individual members of the class would create a risk of . . . adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]

- 3 -

Rule 23(b)(1)(B).[1]  In contrast to the current class certified under subdivision (b)(3), if the class is converted to one certified under (b)(1)(B), "Rule 23 does not provide for absent class members to receive notice and to exclude themselves from class membership as a matter of right." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833 n.13 (1999).

Among the traditional varieties of suits encompassed by Rule 23(b)(1)(B) is the limited fund class action, which aggregates "'claims . . . made by numerous persons against a fund insufficient to satisfy all claims.'" *Ortiz*, 527 U.S. at 834 (ellipsis in original) (quoting Rule 23 advisory committee's note).  Plaintiffs allege that discovery following the class certification order, including "the location of more E-Ferol recipients than anticipated, raises concerns on behalf of the Plaintiffs and the class they represent as to whether the insurance coverage is sufficient (the Defendants have no assets) to cover the claims based on prior settlements in this litigation." P. Br. 3.  They request on this basis that the court modify the class certification order to a Rule 23(b)(1)(B) non-opt-out class.[2]

---

[1] Because the court has previously determined in its class certification order that plaintiffs satisfy the requirements of Rule 23(a), it need not revisit that determination.

[2] Plaintiff's propose, *inter alia*, that (1) each class member receive personal notice, but without the right to opt-out of the class; (2) each class member be entitled to a jury trial; (3) the court conduct a series of trials consisting of ten claimants each, five selected by plaintiffs and five selected by defendants; (4)

"While neither [Rule 23(b)(1)(B)] itself, nor the Advisory Notes accompanying it, purport[ ] to delineate the outer limits of the Rule's application in the particular subset of 'limited fund' cases, the Supreme Court in *Ortiz* has read the 'limited fund' case as being moored to the Rule's historical antecedents." *In re Simon II Litig.*, 407 F.3d 125, 137 (2d Cir. 2005).  For instance, the Court described the classic "limited fund" actions as involving "'claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident, and others.'"  *Ortiz*, 527 U.S. at 834 (quoting 1 Herbert B. Newberg & Alba Conte, 1 *Newberg on Class Actions*, § 4.09, at 4-33 (3d ed. 1992)); *see also id.* at 842 ("It is true, of course, that the text of Rule 23(b)(1)(B) is on its face open to a more lenient limited fund concept, just as it covers more historical antecedents than the limited fund.").  The Court found support for its limiting construction of the Rule in "the Advisory Committee's expressions of understanding, minimiz[ing] potential conflict with the Rules Enabling Act, and avoid[ing] serious constitutional concerns."  *Ortiz*, 527 U.S. at 842.  As to the latter concern, denial of both Seventh Amendment jury trial rights and Fifth Amendment due process principles regarding the right to

---

mediation attempts continue, until all claims have been settled or tried; (5) no judgment or settlement be paid until all claims have been adjudicated; and (6) each settlement or judgment be paid pro rata from the available limited fund.

a "day in court" are implicated in aggregating mass torts. *Id.* at 845-47. In circumscribing the universe of limited fund class actions to those rooted in history, the Court expressed serious concerns about the application of Rule 23(b)(1)(B) to mass tort class actions. *See id.* at 845 ("[W]e do recognize that the [Advisory] Committee would have thought such an application of [Rule 23(b)(1)(B)] surprising, and take this as a good reason to limit any surprise by presuming that the Rule's historical antecedents identify requirements.").

Drawing upon the "historical model" of limited fund cases, the Court has articulated three common characteristics of limited fund class actions. *Id.* at 838-40. "The first and most distinctive characteristic is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all claims." *Id.* at 838. Indeed, the Court emphasized that this first factor is the "most characteristic feature of a limited fund action." *Id.* at 848. The second characteristic is that "the whole of the inadequate fund was to be devoted to the overwhelming claims." *Id.* at 839. The third is that "the claimants identified by a common theory of recovery were treated equitably among themselves." *Id.* The Court described these characteristics as "presumptively necessary, and not merely sufficient, to satisfy limited fund rationale." *Id.* at 842.

III

Despite the Supreme Court's expressions of doubt about the use of limited fund class actions to aggregate mass tort claims, plaintiffs contend that "*Ortiz* did not preclude Rule 23(b)(1)(B) . . . from being used to deal with mass tort litigation." P. Reply. Br. 1. The court understands plaintiffs to make two contentions supporting conversion to a Rule 23(b)(1)(B) limited fund class. First, they appear to maintain that the Supreme Court's limiting construction of Rule 23(b)(1)(B) is inapplicable (or, at least, less stringently applicable) here because *Ortiz* addressed the concerns of certifying a settlement class and, relatedly, the constitutional concerns expressed in *Ortiz* are adequately addressed in this case. Alternatively, plaintiffs urge that they have satisfied the requirements of a limited fund class outlined in *Ortiz*. The court will address plaintiffs' contentions seriatim.

IV

Plaintiffs maintain that *Ortiz* is distinguishable. "The *Ortiz* court was clearly concerned about conflicts arising in a mandatory class settlement when it outlined the requirements of such a settlement class," whereas "[t]his is not a settlement class." P. Reply. Br. 2 (emphasis omitted). This distinction is significant, they contend, because "[t]his class provides for all of the

- 7 -

constitutional safeguards, including representation by counsel of a member's choosing if desired and jury adjudication of contested issues of each claim, if necessary." *Id.*

Although *Ortiz* involved certification of a settlement class, the Court did not limit its discussion of the historical roots of limited fund classes to settlement classes. *See Ortiz*, 527 U.S. at 832-841. In equating the scope of Rule 23(b)(1)(B) class actions with their "historical antecedents," the Court relied on three justifications: the Advisory Committee's intention that "subdivision (b)(1) . . . capture the 'standard' class actions recognized in pre-Rule practice;" the rights of individual tort victims under state law, as provided for under the Rules Enabling Act; and constitutional considerations, including the Fifth and Seventh Amendments. *Ortiz*, 527 U.S. at 843. Assuming the constitutional concerns may prove less burdensome in the certification of a litigation class as opposed to a settlement class, the intention of the Advisory Committee and concerns of the Rules Enabling Act still counsel against liberal interpretation of Rule 23(b)(1)(B).[3]

Moreover, and significantly, the Court did not limit its holding in *Ortiz* to certification of settlement classes. In fact,

---

[3]For instance, unlike settlement class participants, these litigation class participants would retain a Seventh Amendment right, although potentially circumscribed, to have their claims tried to a jury.

the Court referred to the foregoing three characteristics as "the essential premises of mandatory limited fund actions," which surely extend beyond settlement classes. *Id.* at 848. The Court strongly admonished lower courts to read Rule 23(b)(1)(B) itself narrowly because "the object was to stay close to the historical model." *Id.* at 842. Finally, other courts have applied *Ortiz* when addressing certification of litigation classes. *See, e.g., In re Simon II Litig.*, 407 F.3d at 127 (vacating certification of litigation class seeking punitive damages against tobacco companies where plaintiff failed to demonstrate first *Ortiz* factor); *In re Complaint of River City Towing Servs., Inc.*, 204 F.R.D. 94, 96 (E.D. La. 2001) (denying certification of litigation class under Rule 23(b)(1)(B) because, *inter alia*, requirements of *Ortiz* not met); *Doe v. Karadzic*, 192 F.R.D. 133, 138 (S.D.N.Y. 2000) ("Nothing in the [*Ortiz*] opinion renders its analysis unique to a settlement class."). Accordingly, the court concludes that plaintiffs must demonstrate the "presumably necessary" characteristics of a limited fund case, as outlined in *Ortiz*, to modify their litigation class to one certified under Rule 23(b)(1)(B).

V

The court now considers whether plaintiffs have met their burden of showing that this case has the three characteristics necessary for certification of a limited fund class action. This

question turns on whether plaintiffs can satisfy the "first and most distinctive characteristic . . . that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Ortiz*, 527 U.S. at 838.[4] In doing so, the court will assume *arguendo* that plaintiffs' claims are liquidated within the meaning of *Ortiz*.

A

In *Ortiz* the Supreme Court "alluded to the difficulties facing limited fund treatment of huge numbers of actions for unliquidated damages arising from mass torts, the first such hurdle being a computation of the total claims." *Id.* at 850. To calculate the aggregate total of the claims, plaintiffs rely on the average settlement value of 133 prior E-Ferol claims. They present evidence of the average settlement value of death claims and the average settlement value of non-death claims. They have currently identified 391 potential class participants, of whom 67 involve death cases and 321 non-death cases. Multiplying the average settlements of the prior death and non-death claims by the number of potential claimants, plaintiffs estimate total claims of approximately $233 million.

In *Ortiz* the Court assumed *arguendo* that "prior judicial

---

[4]Plaintiffs do not address the second or third characteristics of limited fund classes described in *Ortiz*.

- 10 -

experience with asbestos claims would allow a court to make a sufficiently reliable determination of the probable total." *Ortiz*, 527 U.S. at 850. Unlike "mature" tort cases such as the asbestos litigation at issue in *Ortiz*, however, plaintiffs' estimate of potential claim liability does not provide the court with any comfortable certainty of the total value of the claims. Their reliance on past settlements, although perhaps sufficient to generalize about the value of the claims, is inadequate to present a reliable total of the aggregated liquid claims. The data lack reliability because they include no evidence of cases tried or jury verdicts rendered. *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 1999 WL 782560, at *7 (E.D. Pa. Sept. 27, 1999) (rejecting total claim value where "little present experience from cases tried on the brink of trial" and "no arms length, 'white-knuckle' or 'down to the wire' settlements").[5] Indeed, plaintiffs' proposal to conduct "a series of trials consisting of ten claimants each (five selected by the Plaintiffs and five selected by the Defendants)," P. Br. 6, "to determine the amount of each valid claim," P. Reply Br. 5, undercuts the premise that their methodology produces a reliable

---

[5] Plaintiffs have submitted under seal documents that disclose information about settlements in individual E-Ferol cases that their counsel handled. *See* Exs. E and F. Because the court is discussing average settlement figures that are discernible from plaintiffs' publicly-available briefs and is not disclosing in this memorandum opinion the content of any document submitted under seal, it need not file this memorandum opinion under seal.

- 11 -

total.

Moreover, most of the past settlements were paid more than 20 years ago, between 1984 and 1986. The amount of claims sought by this class may thus differ significantly from the estimates extrapolated from prior out-of-court settlements. Individuals who sued in the aftermath of E-Ferol's recall may have had identifiable injuries that were more easily traceable to the administration of E-Ferol. Because defendants strongly contest causation for claims for long-term or latent injury, the claims may result in damage awards that are not comparable to the settlements reached two decades ago. Finally, plaintiffs' valuation rests entirely on an average of prior settlement amounts, whereas, as defendants point out, the median of those amounts is significantly lower. Without deciding which valuation method is proper, the court is able to conclude that plaintiffs' $233 million estimate is at best very rough. Accordingly, the court is unable to reach a sufficiently reliable conclusion regarding the probable total of the aggregated liquid damages.

B

The next consideration relates to the amount of funds available to satisfy the claims. Plaintiffs allege that only insurance proceeds totaling $210 million are available to satisfy the claims of $233 million. As evidence that only liability insurance policies are available, they point to the deposition

testimony of corporate representatives of O'Neal and Retrac.  An O'Neal representative testified that, in late 1984, O'Neal sold its assets to Forest Laboratories for approximately $6 million, which included the assumption of $2 million in debt.  O'Neal retained $150 million in liability insurance to cover E-Ferol claims.  A Retrac representative testified that CVS Revco and its subsidiaries (which included Retrac), underwent bankruptcy proceedings in 1991-92.  Under the approved plan of reorganization, Retrac was relieved of all liabilities, except as to the liability insurance that insured the E-Ferol claims.  Defendants do not contest that only liability insurance policies exist to cover the claims; rather, they assert that the coverage available is much greater than plaintiffs' estimate.

Plaintiffs maintain that Retrac's liability insurance from June 1, 1983 to June 1, 1984—the relevant policy period—totaled approximately $85 million.  They contend that O'Neal, however, possessed two relevant periods of insurance coverage: the calendar years of 1983 and 1984.  They estimate that, in 1983, O'Neal had $150 million in total coverage, and, in 1984, it had $151 million in total coverage.  Because some of the coverage has been paid out to claimants and some insurers are now insolvent, plaintiffs value O'Neal's available coverage for each calendar year at approximately

$125 million.[6]  They contend, moreover, that because the vast majority of E-Ferol was not shipped until after January 1, 1984, a significant number of infants did not receive it until after that date, and that O'Neal's 1983 coverage of $125 million should not be included in its total coverage calculation.  Accordingly, they estimate the limited fund available at $210 million, consisting of $125 million from O'Neal's 1984 policies and $85 million from Retrac's policies.

Assuming *arguendo* that only the foregoing insurance policies are available to cover the damages plaintiffs seek, plaintiffs have failed to proffer evidence that the coverage is in fact limited to $210 million.  Specifically, available insurance from O'Neal's 1983 policies increases potential funds to well over $300 million and would be sufficient to satisfy plaintiffs' claims valuation of $233 million.  Although plaintiffs contend that the 1983 policies will not be available to cover defendants' liabilities (because it is unlikely that a significant number of babies received E-Ferol prior to January 1, 1984), the court is not convinced at this stage of the litigation of the insufficiency of the policies to cover total claims.  Indeed, the available evidence indicates that approximately 50 of the 391 known potential claimants were born in 1983.  And although it is possible that some of the babies born in

---

[6]Plaintiffs represent that neither Retrac's nor O'Neal's policies have carry-over coverage into future policy periods.

- 14 -

1983 received E-Ferol in 1984 rather than 1983 such that the 1983 policies would not afford coverage, plaintiffs have offered no evidence to support this contention. In sum, plaintiffs have failed to demonstrate adequately that the aggregate policy limits are insufficient, especially when coupled with the unconvincing evidence that the total claim amounts can be assessed at $233 million. *See Ortiz*, 527 U.S. at 850.

\* \* \*

The Supreme Court in *Ortiz* counseled "against leniency in recognizing . . . limited fund actions in circumstances markedly different from the traditional paradigm." *Id.* at 864. "[T]he ability to utilize a limited-fund class action under Rule 23(b)(1)(B) to handle mass-tort cases was severely restricted by [*Ortiz*]." 7B Charles Alan Wright et al., *Federal Practice and Procedure* § 1805, at 419 (3d ed. 2005). Plaintiffs have failed to meet the first recognized characteristic of a limited fund class. Accordingly, the court declines to convert plaintiffs' class action to a Rule 23(b)(1)(B) limited fund class action, and it denies plaintiffs' October 20, 2005 motion to modify the court's class certification order.

**SO ORDERED.**

February 13, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 15 -