IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

VICTORIA KLEIN, et al.,              §
                                     §
              Plaintiffs,            §
                                     § Civil Action No. 7:03-CV-102-D
VS.                                  § (Consolidated with
                                     § Civil Action No. 7:09-CV-094-D)
O'NEAL, INC., d/b/a O'NEAL,          §
JONES & FELDMAN                      §
PHARMACEUTICALS, et al.,             §
                                     §
              Defendants.            §

MEMORANDUM OPINION
AND ORDER

The court must decide whether the proposed $110 million[1]
settlement of this class action alleging personal injury and death
claims arising from the manufacture, marketing, and distribution of
E-Ferol Aqueous Solution ("E-Ferol") is fair, reasonable, and
adequate, as Fed. R. Civ. P. 23(e)(2) requires, and not the product
of collusion between the parties.  Following a two-day fairness
hearing and consideration of the parties' extensive submissions,
and for the reasons that follow,[2] the court approves the settlement
and the request of the class plaintiffs' attorneys for a fee award
of 30% of the settlement amount, reimbursement of reasonable and
necessary expenses associated with the litigation, $300,000 from

---

[1]As explained *infra* at § I(C), due to insurance coverage
issues, the settlement amount ranges from a low of $90 million to
a high of $110 million, depending on the outcome of claims against
three insurance companies.

[2]The court sets out in this memorandum opinion and order its
findings of fact and conclusions of law.  *See* Rule 52(a)(1).

the settlement amount to pay for costs of administration and distribution of the settlement proceeds, and $75,000 each as compensation for the two class representatives.

I

A

This mass tort class action arises from defendants' manufacture, marketing, and distribution in 1983 and 1984 of E-Ferol, a vitamin E supplement administered primarily to premature infants to aid in preventing a vision impairment known as retrolental fibroplasia, believed to be caused by a vitamin E deficiency.[3] Defendants marketed E-Ferol as a vitamin supplement rather than as a drug. The class plaintiffs allege that defendants made this marketing decision so that they could bypass testing requirements mandated by the U.S. Food and Drug Administration ("FDA") for the sale of a "drug"; there were no similar requirements for new "supplements." The class plaintiffs also assert that defendants specifically marketed E-Ferol as a means of

---

[3]These are consolidated cases. Federal Insurance Company filed a lawsuit in Northern District of Ohio seeking a declaratory judgment that it has no duty to defend or indemnify the corporate predecessor of CVS Revco D.S., Inc. ("CVS") under an insurance policy issued to CVS's corporate predecessor for personal injury claims arising from the manufacture and distribution of E-Ferol by Carter-Glogau Laboratories, Inc., a former subsidiary, now known as Retrac, Inc. The case was transferred to this court on June 16, 2009, see Federal Insurance Co. v. CVS Revco D.S., Inc., 7:09-CV-094-D (N.D. Tex. docketed June 16, 2009), and was later consolidated with the class action. In this memorandum opinion and order, the court will refer to the class action as a single case that does not include this declaratory judgment action.

- 2 -

reducing or preventing retrolental fibroplasia, and that physicians and hospitals began using E-Ferol under the mistaken impression that it had FDA approval.  E-Ferol's appeal was its suitability for intravenous administration, a delivery method that was considered superior to the previously available oral or intramuscular applications of vitamin E for premature infants.  To allow for intravenous use, E-Ferol contained an emulsifying agent known as Polysorbate 80, which made the vitamin E water soluble.

Several months after the initial release of E-Ferol, medical providers, the FDA, and the Centers for Disease Control and Prevention ("CDC") became aware of a pattern of harmful symptoms in premature infants to whom the drug had been given.  These symptoms—which generally involved failure of the kidneys and liver—in many cases led to brain injury, blindness, and/or death, and came to be known as "E-Ferol syndrome."  The FDA and CDC ordered defendants to conduct a full recall of the product and began investigating possible causes of the symptoms that neonatologists were reporting.  Research determined that the ingredient Polysorbate 80 in E-Ferol caused the symptoms associated with E-Ferol syndrome.  The investigation into E-Ferol eventually led to criminal convictions for the defendant corporations as well as some of their individual officers.  *See United States v. Hiland*, 909 F.2d 1114 (8th Cir. 1990).

B

This lawsuit was filed as a putative class action on behalf of all persons who were administered E-Ferol during the months that it was in use, the representatives or heirs of persons whose deaths were caused by E-Ferol, and family members, guardians, and legal representatives of persons who died from or were injured by E-Ferol.  Plaintiffs alleged claims for negligence, strict liability, and negligent misrepresentation, and they sought actual and punitive damages for the deaths and injuries that E-Ferol allegedly caused.  Judge Buchmeyer, to whom the case was initially assigned, certified the following plaintiffs class under Rule 23(b)(3):

> All persons in the United States, including any estate representatives or heirs of deceased persons, who, during the period from November 1, 1983, until April 30, 1984, were administered E-Ferol. Included in the class are parents, spouses, children, guardians, and legal representatives of such persons with direct or derivative claims.

*Klein v. O'Neal, Inc.*, 222 F.R.D. 564, 566 (N.D. Tex.) (Buchmeyer, J.) ("*Klein I*"), *pet. for leave to appeal denied*, No. 04-00028 (5th Cir. June 21, 2004) (per curiam) (order).[4]

Counsel for the class undertook a lengthy process of identifying and contacting potential class members.  They began by obtaining a list from the FDA of all hospitals nationwide that had

---

[4]The Fifth Circuit denied defendants' petition for leave to appeal under Rule 23(f).  One panel member would have granted the petition.

- 4 -

administered E-Ferol, and then contacting these hospitals to request the names of the individual recipients. Eventually, 89 locations nationwide were identified as having administered E-Ferol. Some hospitals were willing to share information with class counsel. Others did not produce information until they were subpoenaed and/or were unsuccessful in moving to quash efforts to obtain patient names. Once potential class members were identified, class counsel contacted them and requested that they complete a medical questionnaire and an authorization to release hospital records.

Notification to the class was given in July 2006 by direct mail (for those whose names and addresses were known) and through simultaneous publication in numerous daily newspapers throughout the United States, including *USA Today*, in an attempt to notify unidentified class members whose hospital records were still unknown. Class counsel also created a website at "www.eferol.com." The website contained information about E-Ferol's distribution and effects, an explanation of this lawsuit, links to the parties' filings and the court's opinions, a list of relevant deadlines, and contact information for any person who believed he should be included in the class. The court set September 11, 2006 as the opt out date for class members.[5]

---

[5]Four potential class members opted out. Class counsel are unaware of any independent suit related to E-Ferol filed by any of them.

Class counsel eventually identified 328 recipients of E-Ferol. The class is currently comprised of 369 members, including the families and representatives of deceased recipients.  Of the 328 identified cases of E-Ferol administration, 34 are infants who allegedly died from the effects of E-Ferol, 22 are infants who allegedly suffered brain or neurological injuries (i.e., cerebral palsy) from E-Ferol exposure, and 239 are class members who either received E-Ferol without apparent injury, but require ongoing medical monitoring, or are the parents of children who died after being administered E-Ferol but whose deaths are not believed to have been caused by E-Ferol.

Also included are 33 claims that the court previously dismissed due to defenses based on statutes of limitations or of repose.  *See Klein v. O'Neal, Inc.*, 2008 WL 2152030, at *10 (N.D. Tex. May 22, 2008) (Fitzwater, C.J.) ("*Klein II*").   In 2008 defendants moved for partial summary judgment, contending that (1) all wrongful death and survival act claims based on deaths that occurred more than two years prior to the lawsuit were time-barred, and (2) claims by class members in Tennessee and Iowa were barred by those states' statutes of repose.  The court denied summary judgment as to most of the death and survivor act claims on the basis that the statute of limitations may have been tolled under the doctrine of fraudulent concealment.  *See id*. at *7.  But the court granted summary judgment as to eight death claims, concluding

- 6 -

that a reasonable jury could only find that the class members knew that E-Ferol might have caused their child's death.  *Id.* at *6. The court also dismissed 25 claims as barred by the Tennessee statute of repose.  It denied summary judgment dismissing the single claim from Iowa, however, concluding that there was evidence that the claimant had no knowledge about receiving E-Ferol until after the lawsuit was filed.  *Id.* at *10.[6]

After the court decided *Klein II*, it stayed the case so that the parties could pursue settlement.  The parties participated in mediation, including a two-day meeting, in 2009.  A retired United States District Judge, John S. Martin, Jr. ("Judge Martin"), served as mediator.  Although the parties were initially unsuccessful, subsequent negotiations over several months led to the Settlement Agreement and Release ("Settlement Agreement").  As discussed more fully below, in exchange for the release of all claims brought by the class plaintiffs, the Settlement Agreement provides a lump sum

---

[6]In *Klein II* the court raised *sua sponte* whether the class should be decertified.  Based on the arguments of the parties in their summary judgment briefing—regarding the tolling effect of plaintiffs' reasonable reliance and defendants' fraudulent concealment—the court questioned whether issues common to the class continued to predominate in the case.  "[T]here are material differences in the factual circumstances of each claim that could affect the jury's analysis . . . .  [I]t now appears that individualized fact issues predominate with respect to the reliance and reasonable diligence inquiries."  *Klein II*, 2008 WL 2152030, at *8-*9.  The court ordered the parties to brief the question whether the class should be decertified or modified in some way, but this order was stayed pending the settlement negotiations that eventually resulted in the proposed settlement.  The court explains below why the issue it raised in *Klein II* is no longer of concern.

payment to the class for distribution among its members.[7] The allocation to each member varies according to the category to which the member's claim is assigned. Medical experts retained by class counsel determined each class member's initial category, with stronger claims resulting in higher-paying categorization. The parties presented the Settlement Agreement to the court for a preliminary fairness review in October 2009.

Following initial approval, the class plaintiffs sent notices to each class member informing the member of the details of the Settlement Agreement, the member's category assignment, and the scheduled fairness hearing on February 16 and 17, 2010. The notices also included instructions for how class members could object to court approval of the Settlement Agreement, make requests for a change in category, and/or submit documents supporting such requests. The notices were sent in October 2009, and the deadline for filing objections and making requests for category changes was December 30, 2009. Class counsel also published a new notice in *USA Today* containing information about the proposed settlement.

C

The Settlement Agreement comprehensively resolves all claims between the class plaintiffs and defendants. The negotiations between the parties and the drafting of the Settlement Agreement

---

[7]Attorney's fees for class counsel and other expenses will also be paid from this lump sum.

included the input and eventual consent of various insurers of defendants, who bear all responsibility for paying the settlement proceeds.[8]  The Settlement Agreement calls for a maximum payment of $110 million to the entire class.

Two insurers of defendant Retrac, Inc. ("Retrac")——Federal Insurance Company ("Federal") and Westchester Fire Insurance Company ("Westchester")——whose coverages together represent approximately $17.5 million of the proceeds of the proposed settlement, have not agreed to the Settlement Agreement.  They also dispute that they have a duty to indemnify Retrac for the class plaintiffs' claims.  Resolution of these coverage questions remains outstanding.  The court dismissed an attempt by the class plaintiffs to sue Federal and Westchester directly for the purpose of establishing that they have a duty to indemnify Retrac for claims brought by the class.  *See Klein v. O'Neal, Inc.*, 2009 WL 3573849, at *9 (N.D. Tex. Oct. 30, 2009) (Fitzwater, C.J.) (holding that Texas law does not permit tort victim to file indemnity suit directly against alleged tortfeasor's insurer until after victim first obtains judgment against tortfeasor).  A third Retrac insurance carrier, Mission Insurance Company ("Mission"), would be responsible for $2.5 million in coverage, but Mission is insolvent and class counsel are currently pursuing recovery from Mission's

_____

[8]The corporate defendants have no real assets other than their right to insurance coverage for the claims raised by the class plaintiffs.

receiver.

A substantial majority of defendants' relevant insurers, representing $90 million of the proposed settlement, have agreed to the Settlement Agreement. The unresolved nature of Federal's and Westchester's liabilities, along with Mission's insolvency, mean that the total settlement amount is not certain, although it would in any case be between $90 million and $110 million. If the Settlement Agreement is approved, defendants will assign to the class their respective rights of indemnification against Federal, Westchester, and Mission.

Under the terms of the Settlement Agreement, each class member is assigned to one of five categories. Category 1 consists of death claims in which E-Ferol was a substantial cause of the death. Category 2 represents death claims for which E-Ferol was only a contributing cause of death. Category 3 is composed of claims that E-Ferol was a substantial contributing cause of cerebral palsy or another neuroglial impairment, with subcategories defined for impairments that are (a) severe, (b) moderate, or (c) mild. Category 4 contains claims alleging injury that do not qualify for Categories 1 through 3, including claims for ongoing medical monitoring costs due to the potential effects of E-Ferol. Category 5 consists of class members whose claims the court has previously dismissed on various grounds, and it is divided into subcategories based on the primary category under which the dismissed claim

otherwise would fall.   The initial assignment of a class member
into a category and subcategory was made by medical experts, and
the assignment was based on the strength of the medical records and
other evidence relevant to each class member's claim.

The total settlement proceeds are allocated by percentages
among the five categories.   Class members each take an equal per
capita share of the payout amount allocated to their particular
category or subcategory.[9]   The allocations are: (1) 40% for
Category 1 (approximately $2,001,594.20 per claim[10]); (2) 17.78% for
Category 2 (approximately $1,000,797.14 per claim); (3) 31.11% for
Category 3 (approximately $1,501,195.62, $1,250,996.34, or
$1,000,789.68 per claim, based on subcategory); (4) 9.29% for
Category 4 (approximately $35,027.19 per claim); and (5) 1.82% for
Category 5[11] (approximately $236,647.45, $118,323.27, or $4,141.50

---

[9]To calculate each class member's individual share, the
percentage of the payout attributable to a category or subcategory
is divided equally among the claims of each E-Ferol recipient.
Multiple class members who derive their claims from a single E-
Ferol recipient receive a pro rata share of the award that the
recipient would have received.

[10]Because under the Settlement Agreement class members can
challenge their category placement, and because the net payout to
each member depends on the total number of claimants in a
particular category, the actual money award for each claim is only
approximate at this point.   But only two class members challenged
their category assignment by the December 30, 2009 deadline.
Therefore, any alteration in the category membership numbers——and
thus a modification of the payout to each class member——will be
insignificant.

[11]Category 5 class members receive a portion of the settlement
proceeds even though the court granted summary judgment dismissing

per claim, based on subcategory).  The attorney's fees and expenses that the court awards class plaintiffs' counsel, and the awards to the class representatives, are to be deducted from each class member's recovery on a pro rata basis.

The Settlement Agreement establishes a procedure whereby a class member can request a category change.  The class member must first present the request to class counsel, supported by documents and other evidence that demonstrate why the category change is merited.  If the class member is dissatisfied with class counsels' decision, the member may request a review by an independent medical examiner ("IME"), appointed by the court, to determine the appropriate category.  The decision of the IME is binding.  If the IME concludes that the class member should be re-categorized, the costs of the review process must be borne out of the overall settlement.  If the request is unsuccessful, the costs must be paid from the individual class member's personal share of the settlement.  Class counsel included notice of each member's initial category assignment when the Settlement Agreement announcements were mailed in October 2009.  The court set a deadline of December 30, 2009 for class members to object to their category and submit medical records or other evidence in support of a request for re-categorization.  As stated above, *see supra* note 10, only two class

_____

their claims.

- 12 -

members have sought review through this process.

There is no provision in the Settlement Agreement that allows a class member to opt out.  Under Rule 23(e)(4), however, the court "may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." The Settlement Agreement provides that, if the court does allow class members to opt out, each defendant or insurer can withdraw from the settlement.  Alternatively, defendants can choose to ratify the Agreement notwithstanding an allowance for opt outs.  In the latter case, any class member who opted out would still be counted for purposes of assigning category awards under the settlement payout, but the funds that would otherwise be paid to the excluded class member would be retained by defendants and not included in the overall payment to the class.[12]

As a condition of obtaining an individual award under the Settlement Agreement, a class member is required to execute a release of all liability for defendants and their insurers. Furthermore, the liability release covers "all Persons who provided medical or health care services to any individual who allegedly

---

[12]The Settlement Agreement also provides for the addition of class members who were not known at the time the agreement was drafted, but who later come forward with evidence supporting their inclusion in the class.  The court is not aware of any person who has sought inclusion in the class since it preliminarily approved the Settlement Agreement.

received E-Ferol, including but not limited to hospitals, doctors, [and] nurses." Settlement Agreement Ex. 9 at 2.[13] The release grants an unconditional release and discharge of all claims and causes of action "connected in any manner or fashion with E-Ferol." *Id*. at 3.

D

Following notice of the proposed settlement, 97.3% of the class members——359 of 369——responded to class counsel with affirmative requests that the court approve the proposed settlement. The 97.3% who approve include all but one class member in Category 1, and all members in Categories 2 and 3.

Only three members of the class——Lawrence V. Long, Jr. ("Long"), Sharon Jenkins ("Jenkins"), and Arthur Freeman Luckey ("Luckey")——objected to the Settlement Agreement by the December 30, 2009 deadline. Luckey withdrew his objection, with court approval, before the fairness hearing began. Jenkins withdrew her objection, with court approval, during the fairness hearing. Jenkins and another class member, Cynthia Pinnock, have requested changes in their category assignment. Now that the settlement has been approved, these requests will be resolved according to the IME review procedure established by the Settlement Agreement. The

---

[13]Throughout this memorandum opinion and order, the court cites the Settlement Agreement attached as Exhibit A to class plaintiffs' October 7, 2009 unopposed motion for preliminary approval of class action settlement, approval of class action notices, and approval of non-waiver agreement.

parties agreed to an extended deadline for Jenkins to file medical records in support of her request for category change, which the court approved.   The court also agreed that Jenkins can submit nominees for the court's consideration when selecting an IME to review her category change request.   Following the withdrawal by Luckey and Jenkins of their objections to the Settlement Agreement, Long remains as the lone objecting class member.

Long is a member of the class by reason of the death of his daughter, CL.[14]   CL died in 1984 after receiving E-Ferol while in the care of the neonatal intensive care unit at Miami Valley Hospital ("Miami Valley") in Dayton, Ohio.   Because the E-Ferol recipient list from Miami Valley was still unknown when notice was mailed to class members in 2006, class counsel published notices of this class action in two local newspapers: the *Dayton Daily News* (Dayton, Ohio) and *The Blade* (Toledo, Ohio).   In October 2007 class counsel obtained the recipient list from Miami Valley, and they mailed notice of the class action to Long.   It was at this point, according to Long, that he and his late wife first became aware of the possibility that E-Ferol played a part in CL's death.   Long then obtained independent legal representation (i.e., apart from class counsel) and filed a motion seeking leave to opt out of the class.   He filed the motion on January 9, 2009, although the

---

[14]Although CL's name is stated in full in publicly-available filings and was used during the fairness hearing, the court will follow Rule 5.2(a)(3) and refer to her by her initials.

deadline for doing so had expired on September 11, 2006.  The court denied Long's motion.  *Klein v. O'Neal, Inc.*, 2009 WL 1174638, at *5 (N.D. Tex. Apr. 29, 2009) (Fitzwater, C.J.) ("*Klein III*") (holding, *inter alia*, that due process was satisfied because it was undisputed that Long received constructive notice of the suit through publication in July 2006, and failed to request opt out by the court-ordered September 2006 deadline).  Long has renewed the request to opt out in a motion filed on September 23, 2009.

Essentially, Long seeks to opt out so that he can pursue an independent lawsuit against the defendants and against Miami Valley and the physicians who treated CL (the "Miami Valley Providers"). Long maintains that he can obtain a larger award through an independent lawsuit than he will receive under the proposed settlement.  He also objects to the provision of the Settlement Agreement requiring that he release third-party medical providers, such as the Miami Valley Providers, as a condition of receiving his share of the settlement proceeds.  In addition to objecting on various grounds to the Settlement Agreement, Long also moves for decertification of the class, for leave to intervene, and to opt out of the class.

E

The court conducted a two-day fairness hearing on February 16 and 17, 2010.  On the second day of the hearing, Jenkins, with court approval, withdrew her objection, leaving Long as the lone

- 16 -

remaining objector.   During the hearing, the parties, Long, and Jenkins (until she withdrew her objection) presented evidence and arguments regarding whether the Settlement Agreement is fair, reasonable, and adequate, as Rule 23(e)(2) requires, and not the product of collusion between the parties.   They also presented evidence through witnesses and exhibits.   Counsel also cross-examined witnesses and presented argument.

The class plaintiffs called several medical experts to testify about the causes and effects of E-Ferol syndrome.[15]   The witnesses each have experience researching E-Ferol, and several were among the first and most prominent experts on the drug and its effects during the initial response to E-Ferol syndrome in the 1980s.   For various reasons, including the fact that E-Ferol was only used for a short period more than two decades ago, the available pool of medical experts with knowledge about the drug is notably small.   In many cases, the experts retained by the class plaintiffs and defendants are the same individuals who performed the foundational research and analysis of E-Ferol syndrome.   The authors of virtually all the significant studies and published articles on E-

---

[15]The purpose of both sides' medical expert testimony is not to prove the validity of their respective positions on the merits of the case, but to enable the court to assess the strengths and weaknesses of the class plaintiffs' claims and defendants' defenses and thereby to determine whether the proposed settlement is fair, reasonable, and adequate.  This presentation has assisted the court in determining the likelihood that the class plaintiffs will succeed on the merits and has enabled it to compare the proposed settlement amount with the likely recovery if the case were tried.

Ferol were involved in this litigation at some point, and several testified at the fairness hearing.

The class plaintiffs first presented Carl J. Bodenstein, M.D. ("Dr. Bodenstein"), a neonatologist, who testified about the initial process of discovering and diagnosing cases of E-Ferol syndrome. Dr. Bodenstein coauthored the first published academic article identifying E-Ferol syndrome and participated in the CDC's investigation during the period that immediately followed the recall of E-Ferol. In relation to this class action, Dr. Bodenstein reviewed the records of each class member to verify that E-Ferol was administered and how much of the drug was used in each case, and he determined the relationship between E-Ferol and the claimed injuries or death.

The class plaintiffs next offered the testimony of Kevin Bove, M.D. ("Dr. Bove"). Dr. Bove is a pediatric pathologist at Cincinnati Children's Hospital (a hospital that administered E-Ferol) and a professor at the University of Cincinnati College of Medicine. He testified about his involvement with Dr. Bodenstein in the early efforts to research the causes of E-Ferol syndrome. Dr. Bove stated that the pathological markers associated with E-Ferol syndrome were distinct from typical liver problems among premature infants. He also participated in the instant case by reviewing the definition of the plaintiffs class as well as the categorization of individual class members, and he concluded that

both were consistent with the medical data regarding E-Ferol syndrome. While the most well-developed evidence involving E-Ferol syndrome involves the death cases, Dr. Bove also testified about the medical evidence in the Category 3 brain injury cases, and he admitted that the causation links were weaker in these cases (although, in his view, still probable).

Dr. Bove's testimony regarding the evidence of E-Ferol-related brain injury was supported by William J. Martone, M.D. ("Dr. Martone"), the final medical expert whom the class plaintiffs called. Dr. Martone supervised the CDC investigation into E-Ferol syndrome in 1984 and recommended to the FDA that E-Ferol be recalled. He confirmed that there is a scarcity of research on brain injuries caused by E-Ferol syndrome, although he testified that he is confident such a connection exists.

After the two class representatives testified, lead class counsel, Art Brender, Esquire ("Brender"), testified in support of the settlement and the motion for attorney's fees, costs, and expenses. Brender was cross-examined by lawyers for Long and Jenkins, who challenged his assertions about the fairness of the settlement and class counsels' request for attorney's fees. Plaintiffs then called Professor Jim Underwood ("Prof. Underwood"), an Associate Professor of Law at Baylor Law School,[16] who testified

_____

[16]Prof. Underwood testified that he has now been granted tenure as a member of the faculty of Baylor Law School.

- 19 -

that the settlement is fair, reasonable, and adequate and that the requested award of attorney's fees, costs, and expenses is not only reasonable, but is less than expected in a case of this scale. Drawing on his experience as a class-action litigator and professor of torts and complex litigation (the thrust of which is federal class action law), Prof. Underwood opined that class counsel had provided exceptional representation to the class by identifying and contacting as many potential members as could be found.  He testified that the motion practice in the case indicated hard-fought litigation that placed an unusually high burden on the attorneys and resulted in a favorable settlement for the class. Prof. Underwood praised the arrangement of the settlement categories and the process by which class members could appeal their category placement.  He concluded that "[t]his [settlement] would be a poster child for a class action that works for the benefit of the class." Tr. 1:245.[17]

The class plaintiffs concluded by making a video presentation

---

[17]Citations to "Tr." are to a draft of the hearing transcript prepared by the court reporter to assist the court in preparing this memorandum opinion and order.  Because the transcript is subject to final editing and review by the court reporter, quotations contained in this memorandum opinion and order may not precisely match the wording of the final transcript.  Likewise, the transcript page numbers cited are those reflected in a version of the draft available to the court, and the pagination of the final transcript may be different.  "Tr. 1:" refers to the transcript of the first day of the hearing (February 16, 2010), and "Tr. 2:" refers to the transcript of the second day of the hearing (February 17, 2010).

consisting of several class members who could not attend the hearing and of the decedents of some members.   Several class members attended some or all of the hearing and were introduced after the parties' opening statements.   All of these class members support the proposed settlement.

Defendants first presented Barry Chasnoff, Esquire ("Chasnoff"), their lead counsel, who testified, among other things, about the defenses to liability that his clients intended to raise if the case were to proceed to trial.   He stated that defendants intended to challenge the class plaintiffs' overall expert evidence, especially the causation evidence related to the Category 3 neurological injury claims.   Defendants then called a legal expert, Professor Charles Silver ("Prof. Silver"), a professor at The University of Texas School of Law, who specializes in class action research and has served as class counsel in numerous cases.   Prof. Silver, like Prof. Underwood, opined that the settlement is fair and reasonable overall.   He especially noted the lengths to which class counsel had gone to identify and contact as many individual members of the class as possible.   He found it significant that 97.3% of class members had affirmatively approved the Settlement Agreement, and, of those who had not, only one had raised formal objections.   Prof. Silver stated that such overwhelming affirmative support for a class action settlement, as opposed to mere acquiescence by class members, was extremely rare,

and this reinforced his conclusion that the proposed settlement is fair and should be approved.

Finally, defendants presented the testimony of Michael O'Shea, M.D. ("Dr. O'Shea"), an expert on brain injuries in premature infants. Dr. O'Shea testified regarding the asserted weaknesses in the class plaintiffs' claims, suggesting that evidence of E-Ferol's causation of the injuries——particularly for the brain injury and cerebral palsy claims——was vulnerable to attack. He pointed to a lack of peer-reviewed published materials supporting a connection between E-Ferol and brain injuries. Moreover, Dr. O'Shea opined that generating such evidence for trial would be difficult or impossible, because little research had been done on links to brain injury when E-Ferol was recalled, and the passage of time prevents such studies from being feasible today. Dr. O'Shea explained that, because virtually all of the E-Ferol recipients were premature infants with significant health challenges already, it would be hard for researchers to definitively link a particular injury (such as cerebral palsy) with E-Ferol. He also suggested that rates of brain injury allegedly caused by E-Ferol are consistent with the occurrence of brain injury among premature infants overall——i.e., E-Ferol may not have increased recipients' chances of developing brain injury. Dr. O'Shea concluded that it would be necessary for the class plaintiffs' claims to overcome these significant hurdles if the

settlement were not approved and the claims were tried.

After the class plaintiffs and defendants completed their presentations, Long testified in support of his objections to the Settlement Agreement.  He primarily testified about CL's medical treatment, and he stated that no physician had informed him or his wife of the possibility that E-Ferol could have caused CL's death. Long averred that he first became aware of the possibility that E-Ferol may have caused CL's death when class plaintiffs' counsel mailed him notice after obtaining his identity from Miami Valley. Long testified that he should be excluded from the settlement, on two principal grounds: (1) the settlement amount was too low and undervalued his claim, and (2) the release of third-party medical providers infringed on his right to sue the Miami Valley Providers. Long stressed that his right to his day in court would be improperly extinguished if the proposed settlement is approved.

In addition to their hearing testimony, the parties submitted other evidence before and during the hearing, such as written declarations and exhibits.  They have also made post-hearing submissions.

## II

The court determines first whether the Settlement Agreement is fair, reasonable, and adequate to the class plaintiffs as a whole and not the product of collusion between the parties.

A proposed settlement in a class action must undergo rigorous

testing by the court to ensure that the interests of absent class members are represented. "The gravamen of an approvable proposed settlement is that it be fair, adequate, and reasonable and is not the product of collusion between the parties." *Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004) (internal quotation marks omitted); *see also Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). In exercising its discretion to approve a settlement, the court must "ensure that the settlement is in the interests of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978); *see also Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

Although the court must weigh the facts and law of the case to determine the fairness of the settlement, this does not mean that the court should reach conclusions as to the ultimate merits of the claims or defenses. *See Pettway*, 576 F.2d at 1214 n.69; *Cotton*, 559 F.2d at 1330. "The court . . . must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (internal quotation marks omitted).

In evaluating a proposed settlement, "a trial judge is dependent upon a match of adversary talent because he cannot obtain the ultimate answers without trying the case. Indeed, that uncertainty is a catalyst of settlement." *Id.* at 175. Courts

assess the efficacy of representation in large part by the barometer of the relief that counsel have obtained for the class. The adequacy of the representation is linked to the question whether the settlement is fair and reasonable. *See Reed*, 703 F.2d at 175; *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. Unit A 1982). Where the court finds that counsel have adequately represented the interests of the class, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330. The Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight. Recognizing that various class members may have different priorities in a class action, the Fifth Circuit has concluded:

> Where there is disagreement among the class members concerning an appropriate course of action, it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole. If the attorney's decision in the face of such disagreement affects each class member more or less equally, and no allegation is made that the rights of a definable minority group within the class were sacrificed for the benefit of the majority, the attorney's views must be accorded great weight, and the trial judge's decision to ratify the attorney's action will seldom be overturned.

*Pettway*, 576 F.2d at 1216.

A proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be

- 25 -

fair and adequate considering all the relevant circumstances. "If the terms themselves are fair, reasonable and adequate, the district court may fairly assume that they were negotiated by competent and adequate counsel; in such cases, whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. Apr. 1981). In the context of a class action settlement, "compromise is the essence of a settlement, and the settlement need not accord the plaintiff class every benefit that might have been gained after full trial." *Pettway*, 576 F.2d at 1214 n.69. Accordingly, "[t]he trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330 (internal quotation marks omitted).

The court must apply a six-part test to determine whether the proposed settlement is fair, reasonable, and adequate under Rule 23(e). *See Newby*, 394 F.3d at 301; *Reed*, 703 F.2d at 172. The six *Reed* factors[18] are:

---

[18]Consistent with prior references in this litigation, the court will refer to the six tests set out in *Reed* as the "*Reed* factors."

> (1) the existence of fraud or collusion behind
> the settlement; (2) the complexity, expense,
> and likely duration of the litigation; (3) the
> stage of the proceedings and the amount of
> discovery completed; (4) the probability of
> plaintiffs' success on the merits; (5) the
> range of possible recovery; and (6) the
> opinions of the class counsel, class
> representatives, and absent class members.

*Reed*, 703 F.2d at 172 (citing *Parker*, 667 F.2d at 1209).   In

balancing the six factors, "absent fraud or collusion, the most

important factor is the probability of the plaintiffs' success on

the merits." *Parker*, 667 F.2d at 1209.

"When considering [the *Reed*] factors, the court should keep in

mind the strong presumption in favor of finding a settlement fair."

*Purdie v. Ace Cash Express, Inc.*, 2003 WL 22976611, at *4 (N.D.

Tex. Dec. 11, 2003) (Lindsay, J.).   "Particularly in class action

suits, there is an overriding public interest in favor of

settlement." *Cotton*, 559 F.2d at 1331.   Moreover, the public

interest in settlement is best served when a settlement binds all

parties without allowing for individual opt outs.

> Class litigation when not abused can aid the
> courts by its coagulation of numerous claims.
> It follows that it is relevant to ask whether
> a settlement results in a decision binding on
> the class or whether it acts as a dispersing
> agent.   For example, the ability of the
> *Pettway* class members to opt out of the
> settlement and pursue individual claims
> counseled against approval of a disputed
> settlement.   In contrast, class members here
> who did not earlier opt out of the class are
> bound by the settlement.   *In this sense the*
> *settlement reduces the burdens placed on the*
> *judicial system*.   Admittedly too broad to

- 27 -

> provide analytical heat, these heuristic
> expressions nonetheless shape judicial
> attitude and are properly the backdrop to the
> [*Reed*] inquiries.

*Reed*, 703 F.2d at 175 (emphasis added). Thus courts are to adhere to a strong presumption that an arms-length class action settlement is fair——especially when doing so will result in significant economies of judicial resources——absent evidence weighing against approval. *See Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 843 (E.D. La. 2007) ("The public interest favoring settlement is especially apparent in the class action context where claims are complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses.").

That one class member of 369 has objected to the proposed settlement does not preclude the court from approving it. "[A] settlement can be approved despite opposition from class members, including named plaintiffs." *Ayers v. Thompson*, 358 F.3d 356, 373 (5th Cir. 2004) (citing *Reed*, *Parker*, and *Cotton*). "[I]n assessing the fairness of a proposed compromise, the number of objectors is a factor to be considered, but a settlement can be fair notwithstanding a large number of class members who oppose it." *Pettway*, 576 F.2d at 1215 (citing *Cotton*, 559 F.2d at 1331); *see also Reed*, 703 F.2d at 174 (holding that while total number of objectors is not dispositive, it is one factor that courts should consider in conducting a fairness evaluation).

- 28 -

Once a court is aware that there are objectors to a proposed settlement, it must allow an opportunity for their objections to be heard. *Pettway*, 576 F.2d 1219. "However, this is not to say that the trial judge is required to open to question and debate every provision of the proposed compromise." *Cotton*, 559 F.2d at 1331. When weighing the views of objecting class members, "the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Id.*

After allowing objectors to be heard, "[t]he trial court must then examine the settlement in light of objections raised and set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response." *Pettway*, 576 F.2d at 1219 (internal quotation marks omitted) (quoting *Cotton*, 599 F.2d at 1331). The court must analyze the facts and law relevant to the proposed settlement and must state the reasons justifying its decision. *See Cotton*, 599 F.2d at 1330 ("A mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law will not suffice." (internal quotation marks omitted)). "[I]t is essential that the trial judge support his conclusions by memorandum opinion or otherwise in the record. An appellate court, in the event of an appeal, must have a basis for judging the exercise of the trial judge's discretion." *Id.*

III

The court now turns to the *Reed* factors.

A

The court first looks for the existence of fraud or collusion behind the settlement.  "The Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary."  *Liger v. New Orleans Hornets NBA Ltd. P'ship.*, 2009 WL 2856246, at *3 (E.D. La. Aug. 28, 2009).  Here, no allegations of fraud or collusion have been raised, and none is apparent.  As Long's counsel began cross-examining Brender during the fairness hearing, he stated that he had "no reason to believe and [made] no claim on behalf of [his] client that this settlement was the product of collusion or in any other untoward conduct by yourself [Brender] or Mr. Chasnoff."  Tr. 1:173.  And Judge Martin, the mediator, avers that "[t]he settlement was reached only after a period of hard fought negotiations," Ps. Ex. 41 at 1, and "was the result of arms length bargaining among the plaintiffs' counsel, the defendants and their insurers," *id.* at 2.  This opinion is confirmed by the fairness-hearing testimony of counsel for the class plaintiffs and defendants, and by the legal experts who carefully evaluated the proposed settlement.  *See, e.g.,* Tr. 1:238 (testimony of Prof. Underwood) ("This case was hard fought from the beginning."); Ds. Ex. 2 at 7 (statement of Prof. Silver) ("[T]he relationship between Class Counsel and Defendants was genuinely

adversarial.").

The court finds that the proposed settlement is not the product of fraud or collusion. The evidence points unmistakably to the conclusion that the Settlement Agreement was the culmination of several years of pretrial proceedings, motion practice, and forceful negotiations by the class plaintiffs and defendants. This factor supports a finding that the settlement is fair, reasonable, and adequate.

B

Under the second *Reed* factor, the court considers the complexity, expense, and likely duration of the litigation.

When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened. *See Ayers*, 358 F.3d at 369. This factor weighs strongly in favor of approving the proposed settlement. Although much has been done since 2004 (when the class was certified), considerable work will be required before the suit can proceed to trial. The testimony of counsel for both sides supports the finding that, despite substantial efforts already invested in this case, a great deal more time and resources will be required to prosecute it to a verdict. Brender states in his pre-hearing declaration that "[this] litigation has been extremely expensive and will prove to be even more so in the event this settlement is not approved." Ps.

Ex. 29 at 14.   He cites as examples of the cost entailed in continued litigation the need to rely on a select number of E-Ferol medical experts, the number and geographical diversity of class members, and the need to develop evidence on the disputed issue of causation.   *Id.*   Likewise, Chasnoff testified at the hearing that "the sheer size [and] volume of medical evidence to be considered, the number of individual witnesses who would be involved, and the complexity of plaintiffs' claims would assure a long, complex, and expensive trial."   Tr. 1:10.

The medical experts called by both sides offered evidence regarding the nature of the scientific disputes, concerning both the appropriate methodology and the substance of the claims that would be at issue.   They especially noted the complex causation issues related to the Category 3 brain injury claims.   Each of the class plaintiffs' medical witnesses opined that the brain injuries could be tied to E-Ferol, but each admitted that there was no published study that conclusively proves this link.[19]   *See* Tr. 1:65, 1:92, 1:133.   These witnesses presented evidence about their research and analysis——both at the time of the E-Ferol recall and in preparation for this litigation——that sought to establish the

---

[19]Each of the class plaintiffs' experts noted that his research conducted on brain injuries and E-Ferol would be worthy of publication, suggesting that, although there may be evidence supporting the class plaintiffs' theories, they are not presently well accepted or established.   Otherwise, they might not be considered worthy of publication.

brain-injury connection.  Likewise, in his pre-hearing statement, Prof. Underwood opines that "class members would face significant issues of both general and specific causation and there is every reason to believe that Defendants would mount formidable challenges on these elements of the claims."  Ps. Ex. 28 at 12-13.

Defendants intend to challenge vigorously the causation evidence that the class plaintiffs offer to support their claims, particularly for the Category 3 brain injury allegations and for the claims for costs of ongoing medical monitoring for Category 4 class members who have suffered no apparent injuries.  *See* Ds. Ex. 1 at 4-7.  Dr. O'Shea testified at the hearing that the incidence of brain injury is already high in any population of premature infants.  Consequently, there may be causes other than E-Ferol for the injuries sustained by those in Category 3.  *See* Tr. 2:138.  He opined that flaws existed in the class plaintiffs' evidence, and he concluded that there were "other factors which gave the [Category 3 claimants] a high risk of that brain dysfunction, regardless of E-Ferol."  Tr. 2:139.  Moreover, Dr. O'Shea asserted that the theory supporting the Category 3 claims is itself flawed, even if there were not adequate explanations, other than E-Ferol, for the injuries.  He opined that "the other issue that causes a lot of doubt on the possibility of E-Ferol causing brain dysfunction is that no one has been able to advance an argument of why that is biologically possible."  *Id.*  Although experts for the class

asserted confidence in their conclusions, Dr. O'Shea testified that he did not believe the study proved to a medical certainty that E-Ferol caused the neurological injuries.  Tr. 2:141.  Additionally, defense counsel argued that, even though a significant amount of discovery had already been conducted, additional fact-finding would be required before the case could be tried.  *See* Tr. 1:11.

Finally, defendants intend to appeal the court's decision in *Klein II* denying in part their motion for partial summary judgment asserting the affirmative defense of limitations.  They seek leave to take an interlocutory appeal from that ruling.  If the court allows such an appeal, the trial will be delayed while the appeal is prosecuted.  If the court declines to grant leave to appeal, defendants will presumably take such an appeal if there is an adverse verdict, which will also delay a recovery for the class plaintiffs.  And, of course, if such an appeal were successful, class members' claims could be barred altogether.

The issues recounted above make clear that prolonging the case would lead to an increase in the already-sizeable investments of time and resources by the parties over the seven years since the case was filed.  The fact that it has taken this long for the litigation to proceed to the point of a possible settlement speaks to the nature and scope of the issues in dispute.  The contested issues of causation and the reliability of the class plaintiffs' medical theories tying their injuries to E-Ferol indicate that any

further litigation would require more time and expense for the parties to engage in a battle of medical experts. The efforts required to prove the class plaintiffs' claims at trial would unquestionably be extremely complex and expensive, even if such efforts were guaranteed to be successful (which, of course, they are not). And approval of the proposed settlement would permit class members to recover damages much sooner than would be possible following a trial and probable appeal that might not be concluded for several years. "Ultimately, if Plaintiffs were to succeed at trial, they still could expect a vigorous appeal by Defendants and an accompanying delay in the receipt of any relief." *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *19 (N.D. Tex. Nov. 8, 2005) (Kinkeade, J.).

Approval of the Settlement Agreement provides relief while simultaneously freeing class members and defendants alike from the burdens and uncertainty inherent in additional litigation. The court finds that the complexity, expense, and likely duration of the case supports approving the proposed settlement.

C

Under the third *Reed* factor, the court considers the stage of the proceedings and the amount of discovery completed. It evaluates whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369. A settlement can be approved

- 35 -

under this factor even if the parties have not conducted much formal discovery. *See, e.g., Cotton*, 559 F.2d at 1332. Furthermore, "[t]he scope of the discovery to be conducted in each case rests with the sound discretion of the trial judge." *Id.* at 1333.

The testimony of lead counsel for the class plaintiffs and defendants, the legal expert witnesses, and the court's familiarity with the discovery in this case confirm that the merits of the claims are well known to both sides. Settlement negotiations took place over a period of 14 months and did not begin until five years after suit was filed. Moreover, the parties benefited from the large number (estimated at over 130) of individual lawsuits alleging E-Ferol claims that preceded this case, as well as the prior criminal prosecution. The foundation laid by these cases aided in the development of the facts in this action and provided a means for counsel to measure the approximate value of the claims of class members.

Class counsel were at some point able to identify and contact personally almost all, if not all, known recipients of E-Ferol or their representatives or survivors. This extensive contact with the class meant that each claim could be thoroughly explored, and it allowed the attorneys to evaluate the strength of their respective cases using hard facts rather than mere class-wide generalities. According to counsel, in addition to the

depositions, interrogatories, and other formal discovery, the parties engaged in considerable informal discovery prior to the settlement negotiations.   Class counsel collected discovery materials from the previous E-Ferol lawsuits in addition to the research generated specifically for this case.   Both sides have employed the services of medical experts to evaluate the claims of class members and to understand their various strengths and weaknesses.

Prof. Silver notes that the duration of the current case—which well exceeds his estimate of the typical duration of a class action suit—along with the previous E-Ferol litigation allowed both sides to appreciate the value of the claims. "[C]onsequently, the defendants had no reason to overpay and Class Counsel could easily recognize an inadequate offer." Ds. Ex. 2 at 10.  He opines that the previous E-Ferol lawsuits demonstrate that defendants are not merely trying to use settlement in this case as a means of avoiding discovery that might lead to subsequent cases. Because the facts surrounding E-Ferol are now so well developed, the Settlement Agreement likely represents a realistic estimate of the value of the claims, rather than a bargain struck for some ulterior purpose.  Prof. Underwood confirmed during his hearing testimony that the litigation was well developed and that the motion practice evidenced by the court's docket demonstrated that the merits of the case were well understood by all parties.  Tr.

1:239-40.

The court finds that the litigation is at an appropriate stage
for settlement.  Accordingly, this factor supports approving the
proposed settlement.

D

The fourth *Reed* factor examines the probability of plaintiffs'
success on the merits of their claims.  *See Ayers*, 358 F.3d at 370.
Evaluating  the  likelihood  of  success  "contains  an  internal
tension."  *Reed*, 703 F.2d at 172.

> A  district  court  faced  with  a  proposed
> settlement must compare its terms with the
> likely rewards the class would have received
> following a successful trial of the case. The
> court, however, must not try the case in the
> settlement hearings because the very purpose
> of the compromise is to avoid the delay and
> expense of such a trial.

*Id.* (citation and internal quotation marks omitted).  Despite this
tension, absent fraud or collusion, the most important *Reed* factor
is the probability of plaintiffs' success on the merits.  *Parker*,
667 F.2d at 1209.

Attorneys for both sides presented testimony regarding the
class plaintiffs' probability of success on the merits and the
obstacles to recovery.  In his pre-hearing declaration, Brender
opines:

> The probability of success on the merits in
> this litigation hinges upon the strength of
> the  medical  causation  evidence,  the
> limitations defense in the death cases, the
> liability facts, the passage of time since the

- 38 -

> injury, the strength of the medical research
> by class medical experts, and the insurance
> structure and financial viability of the
> companies that insure both defendants.

Ps. Ex. 29 at 16.   In his pre-hearing statement, defendants'
counsel, Chasnoff, agrees with Brender's characterization of the
challenges to recovery by the class plaintiffs.   Chasnoff notes
that defendants contested the causation element in each case: for
the death cases, he asserts that the class must prove that E-Ferol
caused the deaths of the medically-challenged premature infants in
Categories 1 and 2.   *See* Ds. Ex. 1 at 4-5.   As to the Category 3
brain injury cases, defendants maintain that the class cannot prove
causation within a reasonable degree of medical certainty.   If the
settlement is not approved, defendants intend to present *Daubert*
challenges to the class plaintiffs' medical evidence.   *See id.* at
5-6.   Concerning the Category 3 neurological injury claims,
specifically, Chasnoff opines that the medical evidence is wholly
insufficient to sustain recovery.   *Id.* at 5 ("[Defendants will
argue that [plaintiffs'] theory of causation does not meet the
standards of reliability required by *Daubert* and its progeny.").
As to the claims in Category 4, Chasnoff asserts, first, that some
class members' home states do not recognize a cause of action for
medical monitoring (raising the possibility that these members'
claims would be dismissed), and, second, that all Category 4 claims
will face causation obstacles (i.e., demonstrating that E-Ferol
exposure either increased the risk of developing a serious latent

disease or caused the deaths of the class members' decedents).  *See id.* at 6-7.

Dr. O'Shea's report purports to undermine much of the evidence on which the class relies, and he opines that there is too little medical support for the conclusion that the administration of E-Ferol led to brain injuries such as cerebral palsy.  He testified that the main medical study supporting the Category 3 claims did not involve a control group of premature infants to compare with those receiving E-Ferol, and it did not account for variables that could have caused the claimed injuries.  *See* Tr. 2:136-37.  These challenges are especially potent because, due to the time that has elapsed since the events in question, conducting additional studies or research on E-Ferol's neurological impacts would be difficult, if not impossible.  If the available evidence were shown to be unreliable, this could preclude any recovery for class members in Category 3.  Additionally, brain injuries such as those included in the Category 3 claims are not uncommon among premature infants, even without the influence of E-Ferol, and virtually all of the infants in question had significant health risks before they received the drug.  *See id.* at 139.  The class plaintiffs, of course, dispute the inadequacy of their evidence, but even class counsel admits that if the case were to proceed to trial, "[some] brain damage cases [would be lost] due to the complexity of medical causation."  Ps. Ex. 29 at 18.

Defendants also intend to appeal (with leave before final judgment, or as of right afterward) the court's partial denial of their motion for partial summary judgment on limitations grounds. Although the court rejected at the summary judgment stage defendants' limitations arguments (other than concerning the Category 5 claims, which were dismissed), there are admittedly complex questions of limitations and notice for a class action that is based on events that occurred 26 or more years ago. A successful outcome for defendants' appeal would result in no right of recovery for class members whose claims are time-barred.

Moreover, refusing to approve the settlement will preclude any recovery for class members in Category 5 unless they prosecute and prevail on appeal. The proposed settlement is notable in that it provides reduced, although not insubstantial, recoveries for these claims, even though defendants would essentially be immune to any such liability if the case were tried on the merits and these plaintiffs were unsuccessful on appeal.

The court finds that the evidence regarding the class plaintiffs' probability of success on the merits favors approving the proposed settlement. On the one hand, the class plaintiffs have asserted strong claims that are similar to others that have obtained favorable settlements in prior E-Ferol lawsuits. There is little dispute about the underlying liability of defendants for manufacturing a defective product; the inherent dangers of E-Ferol

are not contested; and the conduct at issue resulted in criminal convictions.  The claims of the class plaintiffs are compelling, and jurors could be persuaded of their merit.

On the other hand, the possibility of defendants' successfully appealing the court's summary judgment decision presents a risk of no recovery for many class members.  Likewise, the difficulty of proving causation, especially for the Category 3 claims, is real. The medical evidence overall is based on a limited pool of available information and would be subject to challenges both in its inherent reliability and in its application to each claim. Moreover, a jury might be reluctant to award damages for acts that took place far in the past, particularly when considering claims for emotional injury and the like.  Finally, the Settlement Agreement provides for sizeable awards to claims in Category 5 that, apart from the settlement, would have no chance of recovery absent the prosecution of a successful appeal, necessitating additional expense and perhaps substantial delay.

Accordingly, the fourth *Reed* factor favors approval of the settlement.

E

1

The fifth *Reed* factor requires that the court consider the range of possible recovery by the class.  This factor compares the recovery for the class under the proposed agreement with the likely

estimated value of the claims if they went to trial.  Under this factor, a court should consider the views of objecting class members when their "objections to the settlement agreement center on their view that the relief it provides is inadequate." *Ayers*, 358 F.3d at 370.

"Parties give and take to achieve settlements.  Typically neither Plaintiffs nor Defendants end up with exactly the remedy they would have asked the Court to enter absent the settlement." *Frew v. Hawkins*, 2007 WL 2667985, at *6 (E.D. Tex. Sept. 5, 2007) (internal citations omitted) (citing *United States v. Armour*, 402 U.S. 673, 681 (1971)).  The court must determine whether, "[t]aking into account the risks inherent in this litigation, as well as the costs of litigation, the settlement amount is fair and reasonable." *Quintanilla v. A & R Demolition Inc.*, 2007 WL 5166849, at *5 (S.D. Tex. May 7, 2007).  The court's analysis of the reasonableness of the recovery provided under the Settlement Agreement can take into account the challenges to recovery at trial that could preclude the class from collecting altogether, or from only obtaining a small amount.  "[A]fter determining if any legal or factual obstacles exist, a district court must make an inquiry into whether the settlement's terms fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits." *Turner*, 472 F.Supp.2d at 849-50 (emphasis added).

2

The Settlement Agreement divides the class members into five categories (and some sub-categories). Class members are classified according to the type of injury claimed and the strength of available proof. Settlement funds are allocated among these categories by prescribed percentages, and each class member is entitled to a pro rata share of the percentage allocated to the member's category. Under the Settlement Agreement, the death claims in Category 1 (where E-Ferol can be shown to be a substantial cause of the death) are allocated approximately $2 million per claim, while the Category 2 death claims (in which E-Ferol was only a *contributing* factor) are allocated approximately $1 million. In Category 3, the recoveries for brain injuries range between $1 million and $1.5 million, with larger amounts awarded for more severe injuries. Category 4 claimants, who include medical monitoring cases and death cases where E-Ferol is not thought to be the cause of death, receive approximately $35,000. Finally, the Category 5 claims, which the court dismissed in *Klein II* on limitations grounds, are allocated sums ranging from $236,000 (for dismissed claims that would otherwise fall into Category 1) to $118,000 (for dismissed Category 2 and 3 claims) to $4,000 (for dismissed Category 4 claims). The payments to each of the classes are reduced by the court's award of attorney's fees and expenses to class counsel and of compensation to the class representatives.

At the fairness hearing and in their written submissions defendants have presented evidence that the proposed settlement amounts are within the range of reasonableness for E-Ferol litigation as compared with settlements in prior suits. Defendants' evidence reflects all known, prior lawsuits alleging death or injury caused by E-Ferol (more than 130 individual cases, all of which settled before trial). Using the settlement amounts per claim from these cases, and adjusting for inflation, defendants' counsel compared the proposed recoveries in this case with averages for the entire body of E-Ferol settlements. He found that, for cases alleging death caused by E-Ferol, the median payout was $1.562 million, and the mean was $2.005 million. *See* Ds. Exs. 1A and 1B. In E-Ferol settlements over personal injury claims, the median value was $567,000 and the mean was $1.1 million. *Id.* Defendants' counsel opined that the mean values were greater than the median due to a number of aberrantly high settlements reached soon after the E-Ferol recall in the mid-1980s. *See* Tr. 1:17.

The data presented by defense counsel, the accuracy of which is unchallenged, reveal that the anticipated payments under the Settlement Agreement compare favorably with the median recoveries obtained in prior settlements of similarly-classified injuries. And they do not diverge greatly from the mean value, even taking into account a number of high recoveries soon after the events took place. In considering whether the settlement payments fall within

the range of reasonably anticipated recoveries, the court is mindful that the passage of time could likely lead to reduced jury awards, even if defendants are found liable. Prof. Underwood testified that a verdict in favor of the class would depend on a jury's being persuaded to award damages based on decades-old injuries, and the temporal remoteness of the events could depress the amounts of such judgments. *See* Tr. 1:242 ("[O]bviously the claims that are filed early on . . . have generally the most sympathetic, grieving parents, where the jury is probably going to be inclined to award a greater amount of damages. So the time is a big factor here."). He noted that "there's a real fear that the jury is going to discount the damages just based upon the fact that the emotional scars from the events have presumably scabbed over to a certain extent, or at least that's going to be the thought of a lot of the jurors who have not had the unfortunate experience of losing a child." *Id.* at 241-42. The court finds it reasonable to discount the potential recovery for a class of plaintiffs who seek recoveries for injuries that occurred years ago.[20] This is particularly true when comparing such an estimate with many of the settlements that are reflected in defendants' data, most of which occurred in the mid-1980s, when the events and injuries in question were relatively contemporaneous with the litigation.

---

[20]Some class members, of course, seek recoveries for ongoing injuries.

Looking beyond E-Ferol litigation to a more comprehensive examination of similar class action settlements, Prof. Silver presents evidence that the payments under the Settlement Agreement well exceed the typical recovery for such claims. *See* Ds. Ex. 2 at 15-26. He compares the recoveries in this case with those from class action settlements in medical malpractice cases involving claims of death or injury to victims between birth and one year of age (the age of virtually all the recipients of E-Ferol). Prof. Silver focuses his research on settlements from Texas and Ohio, but he also reviews data from the other home states represented among class members. In each case, the recoveries under Categories 1, 2, and 3 of the Settlement Agreement exceed both the median and the mean of settlement recoveries overall——often three or four times higher than the typical amount. *See id.*

Prof. Underwood testified that the division of the settlement funds among the various categories of the settlement were fair and appropriate. *See* Tr. 1:244. He noted that the allocation of funds was atypical, in that the neurological injury cases under Category 3 receive lower payments than the death claims under Categories 1 and 2. Prof. Underwood explained this anomaly by pointing to the causation evidence. Whereas the causation arguments in the death cases are fairly well established (although still disputed), the medical evidence establishing causation in the brain injury cases is much thinner and is vulnerable to challenge. Thus it is

reasonable to reduce the value of Category 3 claims to account for problems proving causation that would likely occur if the case were tried. *See* Tr. 1:243-44. He also opines in his pre-hearing declaration that "[t]he scarcity of class members who have voiced any problems with the category into which they have been placed is indicative of a fair and impartial process." Ps. Ex. 28 at 15. His analysis concludes that the overall recovery by the class, and the divisions among categories, are adequate, fair, and reasonable.

The court finds that the evidence comparing the recoveries in this case to those in other E-Ferol settlements supports approval of the proposed settlement. Furthermore, the recoveries under the proposed settlement are significantly higher than the typical recoveries for class actions involving infant death and injury claims in medical malpractice cases. The Settlement Agreement does not contain any provisions for essentially valueless or so-called "coupon" payments. Even the class members who have no apparent injury will receive relief. According to Prof. Underwood, the proposed settlement is a "poster child" for settlements that are fair and beneficial to the class. Tr. 1:245. He opined that "most of these class members probably would be getting zero dollars because they probably wouldn't even know that they had a claim, much less had an advocate to push those claims, but for what counsel has done here and the court's decision to certify it." *Id.*

Moreover, Category 5 payments represent recoveries by class

members whose claims would be foreclosed absent a settlement approved now or a successful appeal achieved after additional expense and delay. As such, the reasonably expected recovery on such claims is essentially zero. Yet, under the proposed settlement, class members in this category will recover as much as $236,000 apiece. Such favorable treatment for the Category 5 claimants is another factor that strongly supports approval.

3

Long in part objects to the Settlement Agreement on the basis that the payment he will receive as a member of Category 1 is insufficient and undervalues his claim. He asserts that he could secure a substantially greater recovery if he were permitted to pursue an independent suit against defendants and others.[21]   In support of this assertion, Long posits that his case is factually similar to another E-Ferol suit that his attorney litigated in the 1980s, and which settled for approximately $6 million dollars, or three times Long's potential recovery here, without adjusting for inflation. He also objects that the proposed settlement does not require payments from a corporate successor of one defendant, who is now known as CVS Revco D.S., Inc. ("CVS"). Defendants' counsel testified, and the class plaintiffs agree, that this is due to a bankruptcy and corporate transaction that eliminated any liability

---

[21]Long also seeks to bring claims against the Miami Valley Providers.  The court addresses this aspect of Long's objections *infra* at § IV(C).

- 49 -

that CVS could have for E-Ferol claims.

Some of Long's arguments are misplaced when framed as objections to the proposed settlement.  It is true that the court must compare the proposed settlement payouts to the various categories with the potential recovery on those claims if the case were tried.  In this regard, knowing the settlement amounts of prior E-Ferol suits is helpful in determining a reasonable range of recovery.  The court is not obligated, however, to evaluate each individual class member separately to determine whether the expected recovery for *that claim* is approximated by the settlement amount.  On the contrary, assuming that a claim (such as Long's) properly belongs within the class, the court can refuse approval only if the recovery *for the class* under the proposed settlement does not bear a reasonable relationship to the anticipated recovery if the class went to trial.  Thus to the extent that Long's arguments address whether the proposed settlement fails to obtain a reasonable recovery for the class as a whole, they are relevant to what the court must decide.  But the court need not delve into the merits of Long's individual claim or hypothesize about what he might recover in his own lawsuit against defendants and/or others.  Likewise, the court need not decide whether Long's individual claim resembles the earlier case that his attorney litigated and that resulted in a $6 million settlement.

The uncontroverted evidence presented by defendants

demonstrates that the settlement payments to class members are within the range of reasonably expected damages for cases of this type. *See Turner*, 472 F.Supp.2d at 849-50. Long's desire to use his counsel's prior litigation experience as the benchmark for what is a reasonable recovery in E-Ferol cases is unpersuasive, particularly because a review of defendants' data demonstrates that the particular case on which Long relies is an outlier——it produced the highest settlement of any E-Ferol lawsuit to date. *See* Ds. Exs. 1A and 1B. The court agrees with Prof. Silver: "if you simply pick the highest case and base your claim on that, well, that's really not what a person——a rational person would do when trying to predict a result." Tr. 2:83-84. It would be unreasonable for the court to rely on the highest recorded recovery in any E-Ferol case, obtained in 1986 (two years after the E-Ferol recall), as the standard for evaluating the proposed settlement in this case more than 20 years later. This is particularly true in light of Prof. Underwood's observation that the passage of time since the events in question will likely result in a reduced verdict. *See* Tr. 1:241-42. The success of Long's counsel in a prior case does not mean that the proposed settlement is unfair to the class as a whole simply because class members are not receiving what Long's client obtained by settling that case.

The court is also unpersuaded that the exclusion of CVS from the Settlement Agreement renders it unfair or inadequate to the

class.  The parties debated in their briefing and at the fairness hearing the legal question whether CVS bore ongoing liability in this case, or whether these liabilities were discharged in a prior bankruptcy proceeding.  Defendants maintain that CVS does not have any liability for the actions of the corporation from which it purchased assets and that, even if CVS were included in the pool of liability defendants, the total payout amount under the settlement would not be increased.  Long has not presented evidence that, if CVS were included in the proposed settlement, the amount paid would be greater.  Defendants posit that the settlement amount was determined by estimating the value of the various claims and arriving at a total aggregate amount—a calculation that the inclusion of CVS would not alter.  Chasnoff testified that the parties did not "just start with a lump sum amount."  Tr. 2:9. Rather, the settlement talks began with "an evaluation of . . . what we believed was the—the settlement value of every class member's claim[], one by one, and that fed into an ultimate settlement amount and that was in our minds as we negotiated." *Id.*

In sum, Long, on the one hand, and the class plaintiffs and defendants, on the other, have different views about CVS's potential liability.  But that is not the point.  What matters is that the question is debatable, and the position taken by the class plaintiffs and defendants is reasonable.  Indeed, given the approach taken by the class plaintiffs in this case and by

plaintiffs generally in mass tort litigation, it is highly doubtful that, if class counsel had a realistic (or perhaps *any*) prospect of obtaining more money by seeking to hold CVS liable, they would have opted not to sue CVS. The court's opinion that the Settlement Agreement is reasonable is bolstered by the fact that "[s]killed and more than adequate lawyers for the class believe[] it to be a good bargain." *Reed*, 703 F.2d at 174. The omission of CVS and its insurers from the proposed settlement does not undercut the finding that the settlement is fair, reasonable, and adequate.

The court concludes that the fifth *Reed* factor supports approving the Settlement Agreement. The evidence demonstrates that the recoveries allowed under the Settlement Agreement bear a reasonable relationship to those in other E-Ferol litigation settlements and compare favorably with settlements in similar class actions overall. Especially when the expected recovery in this case is discounted for the obstacles to the class's succeeding on the merits, see *supra* at § III(D), combined with the age of the class plaintiffs' claims, the settlement is fair, reasonable, and adequate. Accordingly, this factor favors approval.

F

The sixth *Reed* factor examines the opinions of the class counsel, class representatives, and absent class members.

"Counsel are the Court's 'main source of information about the settlement,' *Manual for Complex Litigation* § 21.641, and therefore

the Court will give weight to class counsel's opinion regarding the fairness of settlement." *Turner*, 472 F.Supp.2d at 852 (citing *Cotton*, 559 F.2d at 1330 ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties.")). The *Reed* panel held:

> in reviewing proposed class settlements, a trial judge is dependent upon a match of adversary talent because he cannot obtain the ultimate answers without trying the case. Indeed, that uncertainty is a catalyst of settlement. Because the trial judge must predict, the value of the assessment of able counsel negotiating at arm's length cannot be gainsaid. Lawyers know their strengths and they know where the bones are buried.

*Reed*, 703 F.2d at 175. Because the court is to give significant weight to the opinion of class counsel, it is not routine for a court to overrule a decision that settlement is in the best interest of the class. "[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330. The opinions of class counsel and class representatives clearly favor approving the Settlement Agreement. In his declaration, Brender opines that "it is the overwhelming opinion and request of class counsel, class representatives, and class members that the court approve the settlement." Ps. Ex. 29 at 22.

As for the class members, the support for approval is overwhelming. Of 369 class members, 569 (97.3%) affirmatively request that the court approve the settlement. *See* Ps. Feb. 8,

2010 App. 50.[22]  One person (Long), representing .27% of the class, opposes the settlement.  Moreover, support for approval of the settlement is broad throughout the five categories.  Of 24 members of Category 1, all except Long request approval.  All 28 members of Category 2, and all 22 members of Category 3 support approval. Concerning Category 4, which includes Jenkins, 250 of 257 class members returned declarations, and all of them support approval. Finally, 36 of 38 class members in Category 5 returned declarations, and all of them support approval.  Dozens of class members attended the fairness hearing in person, and others appeared through a video presentation.  All requested approval of the Settlement Agreement.

It is notable that thorough judicial review of class action settlements is required, at least in part, because in the typical case, a court cannot know the opinion of the class that will be bound by the proposed agreement.  In this class action, however, the court has the benefit of declarations from virtually all class members evincing support for the settlement and requesting that the court approve it.  Prof. Underwood considered the proposed settlement to be unique in that virtually the entire class has requested approval by affirmative statement.  *See* Ps. Ex. 28 at 17.

---

[22]This number would increase slightly if the court included Jenkins and Luckey.  Because they withdrew their objections, the court includes them among the class members who do not oppose the settlement; it does not treat them as falling among those who affirmatively request that the court approve it.

He stated that he was unaware of any precedent for a court's failing to approve a proposed settlement as fair when it was explicitly supported by 97.3% of the class. *See id.* at 18. Prof. Underwood testified that "to the extent the court can divine what the general class reaction is to settlement, that ought to be very persuasive to a court as to whether or not this is fair, adequate, and reasonable, because those are all opinions." Tr. 1:246. As even Long notes in his objections, "[p]resumably, all class members who have not objected have no interest in or desire to opt-out and are satisfied with the settlement." Long Obj. 12.

"[A] settlement can be approved despite opposition from class members, including named plaintiffs." *Ayers*, 358 F.3d at 373. The presence of objectors does not necessarily defeat a settlement, and approval can be given even if a significant portion of the class objects. "That several class members desire broader relief, which has been foreclosed by prior court rulings, does not prevent judicial approval of this settlement agreement, which promises substantial relief to the class." *Id.* This case, of course, presents the flip-side of a settlement opposed by a substantial number of class members and named plaintiffs. It is broadly supported. Of three who objected, only one objector remains. And an overwhelming percentage of those who do not object have done more than acquiesce silently; they have affirmatively voted for the settlement and requested court approval.

Accordingly, the court finds that the opinions of class counsel, class representatives, and class members support approval of the settlement.

G

In sum, the court finds as follows: (1) there is no evidence of fraud or collusion in the conduct of the litigation or the negotiation of the Settlement Agreement; (2) the case, if allowed to proceed to trial, would present highly complex issues of fact and law, would entail considerable expense, and would likely remain unresolved for a number of years; (3) the litigation is more than adequately mature for the parties to know the merits of their claims and defenses, especially considering the extensive research done by class counsel and the wealth of information available from prior E-Ferol lawsuits; (4) although the class plaintiffs present strong liability arguments, for the class plaintiffs to prevail on their claims there are significant issues related to limitations and causation (particularly for the Category 3 brain injury claims) that must still be overcome and that leave the ultimate result in question; (5) the payments made under the Settlement Agreement are within the range of reasonable expectations for recoveries if the case were tried; and (6) approval is overwhelmingly supported by class counsel, class representatives, and all but one class member. Accordingly, the court finds and concludes from its analysis of the *Reed* factors that the proposed settlement should be approved.

IV

A

The court now turns to Long's objections that do not fit within the scope of a particular *Reed* factor and therefore were not addressed in § III.  The objections discussed below are made in support of three forms of relief that Long seeks.  First, Long requests that he be permitted to opt out of the class, either by the court's reconsidering its decision in *Klein III* denying his motion to opt out, or under the court's authority under Rule 23(e)(4) to refuse to approve the proposed settlement unless it affords a new opportunity to opt out.  The court addresses this objection in § IV(B).  Second, and alternatively, Long requests that the court refuse to approve the settlement on the ground that it requires that class members release third-party medical providers.  The court addresses this objection in § IV(C).  Third, Long asks that the court grant his other objections, apparently as grounds for disapproving the proposed settlement if he is required to remain in the class.  The court addresses these objections in § IV(D) and (E).

B

1

Long contends that he should be afforded an opportunity to opt out of the case.[23]  He relies on the court's authority under Rule 23(e)(4) to decline to approve the proposed settlement unless class members are given a new opportunity to opt out.  Long maintains that his due process rights were violated because he did not have actual notice of the class action until after the deadline to opt out had elapsed.  Long advanced similar arguments in his January 9, 2009 motion for leave to opt out of the class, which the court rejected in *Klein III*.  The court held that Long was deemed to have received constructive notice of the class action through newspaper publications in 2006.[24]  As such, his failure to opt out by the September 11, 2006 deadline was binding.  *See Klein III*, 2009 WL 1174638, at *4 ("[D]ue process does not require that Long be given another opportunity to opt out after receiving actual notice of the class action . . . .  Because publication notice can satisfy due process, Long does not have the right to opt out now, more than two years after the deadline expired.").

Under Rule 23(e)(4), the decision whether to allow a second

---

[23]Long cites his inability to opt out as a defect in the proposed settlement, and he also requests the right to opt out as the remedy for his objections.

[24]As noted above, notice was published nationally in *USA Today* and in two newspapers near where Long resided: the *Dayton Daily News* (Dayton, Ohio) and *The Blade* (Toledo, Ohio).

opt out is left to the court's discretion.  Moreover, class members who object to a proposed settlement on due process grounds "must allege constitutional violations with 'factual detail and particularity.'" *Newby*, 394 F.3d at 309 (quoting *Jackson v. Widnall*, 99 F.3d 710, 716 (5th Cir. 1996)).  In support of his objection, Long relies on a reformulation of his vaguely-worded claims of due process violations, and he reiterates his prior dissatisfaction with the constructive notice that he received.  In his post-hearing brief, Long supplements this objection with an overview of cases that support the unremarkable premise that notice by publication is less desirable than actual notice, although still sufficient to satisfy due process in some circumstances. Notably, he fails to offer any facts or arguments that demonstrate that class counsel could through reasonable efforts have succeeded in learning Long's identity before the September 11, 2006 deadline for opting out of the class.  In fact, he acknowledges that he would not have known about E-Ferol's possible role in his daughter's death had class counsel not contacted his late wife and him in the first place.  This contact occurred after class counsel obtained the recipient list from Miami Valley in October 2007 and mailed notice of the class action to Long.

2

The court declines in its discretion to refuse approval of the proposed settlement on the ground that it does not permit a second

opt out by class members.[25]   At the core of Long's argument is the
claim that "[d]ue process and fundamental fairness suggest that
Long should be afforded at least one effective opportunity to opt-
out and proceed with his own individual case against not only the
Drug Companies but also against the Ohio Medical Providers."  Long
Obj. 10.   This argument is adequately addressed in *Klein III*.
Specifically, the court held:

> If a class member is given proper notice, such
> as constructive notice by publication, he is
> deemed to have been given the opportunity to
> opt out.   To hold that a class member who
> receives actual notice of a class after the
> opt out deadline must always be given another
> opportunity to opt out, even though he
> received constructive notice before the
> deadline, would defeat the purpose of
> constructive notice.   Actual notice would be
> the only type of notice that could bind a
> class member.   But actual notice is not
> invariably required.

*Klein III*, 2009 WL 1174638, at *3.   Long persists in contending
that he never had an "effective" opportunity to opt out of the
class.   But as the court held, "[i]f a class member receives the
best possible notice practicable and fails to opt out by the
deadline, he is bound by the court's actions concerning the class,
including settlement and judgment."   *Id.* at *2.   Because Long has

---

[25]Although in *Klein III* the court stated that it reserved the
decision whether to allow a second opt out under Rule 23(e)(4), it
did not suggest that it *would* require the right to opt out as a
condition for approving a settlement.   Having considered the
compelling reasons for not allowing a second opt out, the court
approves the proposed settlement despite the absence of this
opportunity.

neither alleged nor established that class counsel failed to provide him with the best notice practicable under the circumstances, his arguments essentially reduce to the premise that binding a party who received constructive notice via publication is constitutionally deficient. This argument, however, has often been rejected. *See, e.g., Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1287 n.5 (11th Cir. 2007) (applying Fifth Circuit precedent) ("Our case law makes clear that Rule 23's mandate that absentee class members be given 'the best notice practicable under the circumstances,' . . . is consistent with the due process requirements of the Constitution, and, in fact, that Rule 23 goes beyond those requirements." (citing *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1103-04 (5th Cir. 1977))).

The court also overrules Long's objection to the extent he maintains that the class plaintiffs and defendants specifically intended to prevent him from opting out. Long argues that including non-opt-out provisions in the Settlement Agreement and releasing defendants from the proposed settlement if the court conditions approval on a second opt out suggest an improper motivation to deny Long his rights. The court finds no persuasive support for this assertion. Despite the best efforts of class counsel, defendants were unyielding on certain key points, including insistence on no opts out and on the requirement that third-party medical providers be released. It is unremarkable that

defendants would seek such relief.  As the court stated in *Klein III*, "[i]n a class action settlement setting, defendants seek and pay for global peace——i.e., the resolution of as many claims as possible."  *Klein III*, 2009 WL 1174638, at *3.  The court finds credible Chasnoff's testimony that defendants were committed to opposing any inclusion of an opt out provision in the Settlement Agreement for any class member.  *See* Tr. 1:20, 2:18 (stating that defendants would not agree to pay substantial amounts to achieve settlement without assurance that doing so would resolve all class members' claims).  This testimony is corroborated by Judge Martin, who states in his declaration that, during the negotiation process, class counsel attempted to permit opt outs under the Agreement, but defendants and their insurers refused.  Judge Martin avers that

> [a]s is often the case in matters involving insurance coverage, the defendants and their insurers were insisting that any payment by them insure finality with respect to their E-Ferol liability.  Therefore, defendants made it a condition of their agreement to pay the settlement amount that there be no opt outs from the class[.]

Ps. Mot. App. 2.  Although "plaintiffs' counsel originally sought to have the settlement agreement contain an opt out provision . . . this was unacceptable to the defendants and their insurers[.]"  *Id.*  According to Judge Martin, defendants were "adamant that they would not pay substantial amounts of money if they would have to continue to litigate with class members who opted out."  *Id.*

This evidence not only defeats Long's assertion of a motive

directed toward him, it supports the court's decision not to allow a second opt out.  Chasnoff testified that, were the court to allow such opt outs, the proposed settlement might be unsalvageable.[26] The court finds that, if the proposed settlement is not approved and the parties are not able to reconstruct a mutually-agreeable bargain, the class as a whole will be prejudiced.  This is particularly true of class members in Category 5, who stand to recover nothing unless they first undergo the uncertainty, delay, and additional expense of an appeal.  The fact that the proposed settlement allows defendants to back out if any class member is permitted to opt out is one indication of the importance that defendants place on maintaining the integrity of the class. Another indication is found in Chasnoff's testimony that defendants' insurers insisted that there be no opt outs.  Chasnoff testified that the settlement was a product of extensive bargaining and give and take, and that tinkering with its elements could well lead to no settlement.  According to Chasnoff, "we have cobbled together this settlement, and I don't represent the insurers but I . . . took them to be serious when they said this was a no opt-out deal in their mind, and that's how it has to be."  Tr. 2:15.

Finally, Prof. Silver testified that non-opt out settlements

---

[26]Additionally, defendants assert that allowing any member to opt out of the class could imperil the class's ability to recover on the disputed insurance funds from Federal and Westchester.  *See* Tr. 2:15-19; *see also supra* § I(C).  Long disputes this assertion.

often benefit plaintiffs classes such as this one because the promise of obtaining global peace provides an incentive for defendants to offer a more generous settlement than they otherwise would.  He also opined that Long had already benefited greatly because of the class action, because it was only through the efforts of class counsel that Long became aware of E-Ferol's role in his daughter's death (and thus of the possibility that he might have a claim against defendants).  Although Long seeks to opt out of the class action and pursue an independent lawsuit, it is only through this class action and the efforts of class counsel to locate Long that he is in a position to recover any compensation for his daughter's death.  Prof. Silver recognized that, if Long had been engaged in individual litigation before being included in the class, his opt out argument would be strengthened.  But where, as here, the only awareness of his claim came through the diligence of class counsels' work on behalf of the class, Long's assertions of due process violations have little, if any, force.

Accordingly, the court overrules Long's objections based on the lack of an opportunity for a second opt out.

C

Long also objects to the Settlement Agreement because it releases third-party medical providers and therefore bars Long from pursuing claims against the Miami Valley Providers.  The liability release covers "all Persons who provided medical or health care

services to any individual who allegedly received E-Ferol, including but not limited to hospitals, doctors, [and] nurses." Settlement Agreement Ex. 9 at 2. Long objects that the Miami Valley Providers are not defendants and are not contributing to the settlement. He maintains that eliminating the medical provider release would not harm defendants or the class. Long asserts that, under Ohio law, he has available causes of action against the Miami Valley Providers that would not lead to any risk of liability for defendants or their insurers. He therefore asks the court to refuse to approve the proposed settlement due to the inclusion of release. Long suggests that, if the release were removed, he would agree to a clause indemnifying defendants if his lawsuit against the Miami Valley Providers resulted in third-party actions against defendants.

At the fairness hearing, attorneys for the class plaintiffs and defendants addressed why the medical provider release was included as a mandatory condition of the Settlement Agreement. Brender testified that the release of third-party medical providers was a key demand that defendants made from the beginning of the negotiations. *See* Tr. 1:224. He stated that the class attempted to negotiate around the provision, including requesting that it be replaced with an indemnity agreement to shield defendants, but defendants were unwilling to settle without a full release. *Id.* ("[W]e tried very hard to negotiate that out of it. [We] attempted

to get them to agree to indemnity type provisions and things of that sort, and they were just firm."). Judge Martin confirmed that this was defendants' position, and he stated that he was convinced that there would be no settlement without such a release. Ps. Mot. App. 2 at 2 (stating that defendants and their insurers "were adamant that they would not pay substantial amounts of money if they would have to continue to litigate . . . potential third-party actions by healthcare providers and hospitals who were being sued or might be sued by class members"). The initial discussions of the release occurred in 2008, before Long moved for leave to opt out. Brender testified that defendants insisted on a medical-provider release as one of their key settlement demands beginning with the earliest stages of settlement talks. *See* Tr. 1:202-03. He opined that any recoveries from medical providers such as Miami Valley would be rare, and thus it was a reasonable compromise to accede to defendants' insistence on a release given the great benefits the class obtained in the Settlement Agreement. *See* Tr. 1:224.

Chasnoff testified that he believed the release of medical providers was a non-negotiable point for defendants' insurers from the outset of negotiations. *See* Tr. 2:10 (testifying that the release was included in "the very first settlement document that we created"). The insurers were concerned that, if the release were not included, the sizeable payouts under the Settlement Agreement

would fail to provide finality.  He also testified that the
defendants themselves also sought insulation from any more
lawsuits, and that it was his opinion "that if [the release] is
dropped that the settlement will fall apart, if that term were not
in there." Tr. 2:21.  Another concern Chasnoff raised related to
Long's assertion that his available Ohio claims against the Miami
Valley Providers would not potentially result in liability to
defendants.  Chasnoff noted that, even if Long's assertions about
Ohio law were correct, the elimination of a release would apply to
all class members, not simply to Long.  Thus another state's laws
could provide a cause of action against other medical providers,
which could potentially jeopardize defendants' insulation from
liability or the expense of litigation.  He concluded: "[T]he
insurers believe that if the medical providers' claims are not
dismissed we could be paying 110 million dollars and still have to
deal with a lot of the same issues we've been dealing with for a
lot of years." Tr. 2:20.  Additionally, Prof. Silver provides
examples in his declaration of third-party releases adopted in
other class action settlements, opining that "similar provisions
appear in many settlements of mass tort lawsuits involving
allegedly defective drugs or medical devices.  The releases vary in
scope, but many are broad, even all-inclusive." Ds. Ex. 2 at 27.

Defendants' desire to settle on terms that eliminate the risk
of further liability or additional E-Ferol litigation is

reasonable.  *See Klein III*, 2009 WL 1174638, at *3 (noting that in a class action settlement setting, defendants seek and pay for global peace).  That entities such as the Miami Valley Providers have not contributed to the proposed settlement does not preclude the court from approving an agreement that releases them, provided the settlement is fair, reasonable, and adequate to the class as a whole.  Furthermore, even assuming that Long's Ohio-based claims against the Miami Valley Providers would not allow for third-party actions against defendants, the record does not eliminate the potential for claims by other class members under the laws of other states.  And even if defendants could not be held liable, they might face the expenses and burdens of litigation, despite paying millions of dollars to settle with the very plaintiffs who would bring the lawsuits.  And there is no guarantee that class members, including Long, could adequately fulfill an indemnity responsibility, even if defendants' insurers agreed to one.

Thus, although the release eliminates Long's right to bring claims against the Miami Valley Providers (who have paid nothing toward the proposed settlement), the court finds that the provision is essential to the viability of the proposed settlement and that the Settlement Agreement, with the release included, is fair, reasonable, and adequate to the class as a whole.  Therefore, Long's objections on these grounds are overruled.

D

Long adopts and incorporates his previously-filed and pending motion for decertification of the class, which the court now denies.[27]   *See infra* § V.   Because Long incorporates his decertification motion into his overall objections to the Settlement Agreement, the court will address his arguments here to assess whether they demonstrate that the settlement is not fair, reasonable, and adequate to the class as a whole.

Long posits that the class should be decertified because the requirements of Rule 23(b)(3), under which Judge Buchmeyer certified the case as a class action in *Klein I*, were not met.

_____

[27]As discussed more fully below, *see infra* § V, both class plaintiffs and defendants assert that Long lacks standing as a class member to bring a motion for decertification.   Long apparently does not contest this contention.   Instead, Long posits that his arguments in favor of decertification are incorporated into his overall objections to the settlement and that as an objecting class member he can raise such arguments.   The other parties apparently do not contest this.   The court can assume *arguendo* that Long is able to raise certification issues in his objections.

Were Long's objections on this ground meritorious, it would likely raise an unusual procedural problem.   It is not entirely clear what remedy Long envisions the court's providing if it determines that his certification objections have merit.   Long does not clearly specify whether he is asking that the court refuse to approve the agreement (because the case was improperly certified), or whether he contends that the court should order the class decertified (based, not on a formal decertification motion, but on objections to the proposed settlement that are grounded in alleged certification defects).   The court need not choose either alternative.   As set forth below, Long's objections do not prevent approval of the Settlement Agreement because they fail to undermine the proof adduced by the class plaintiffs and defendants that the proposed settlement is fair, reasonable, and adequate.   The objections are therefore overruled.

Specifically, Long asserts that each member of the class will be required to prove reasonable reliance on misrepresentations by defendants and the exercise of reasonable diligence in investigating the cause of injury or death in the member's own case. Otherwise, Long argues, each claim is vulnerable to being barred by the Texas statute of limitations. He maintains that, because these questions are necessarily individualized, the Rule 23 requirement of predominance is not met.[28] Although he acknowledges that there are common class-wide questions of liability and the wrongfulness of defendants' action, he argues that these questions are well settled and will not be important disputed issues at trial. Instead, according to Long, the important trial issues will be individualized: proving causation for each claimant's

---

[28]The tenor of Long's arguments resembles concerns that the court raised *sua sponte* in *Klein II*. In its opinion addressing defendants' motion for partial summary judgment, the court noted that defenses of individual notice and reliance as to each class member might defeat the Rule 23(b)(3) predominance requirement necessary for a class action. *See Klein II*, 2008 WL 2152030, at *9 ("At the time of certification, it may not have been apparent to Judge Buchmeyer that a fraudulent concealment defense would be at issue . . . . [I]t now appears that individualized fact issues predominate with respect to the reliance and reasonable diligence inquiries."). The court did not make a final determination, however, that the class should be decertified. Instead, it directed the class plaintiffs and defendants to submit briefing on that question. Shortly after the court issued its order, the parties requested a stay, which the court granted, so that they could pursue settlement negotiations. Due to the stay, briefing on the question of decertification has not yet been submitted. The parties did, however, file responses to Long's motion for decertification, and they argue in favor of maintaining the case as a class action.

injuries, and (most important) the limitations-related questions of reasonable reliance and reasonable diligence in each death claim.

In response, the class plaintiffs first note that Long seeks to decertify the class based on deficiencies that existed at the time certification was granted, even though Long would likely have had no knowledge about E-Ferol or his claims were it not for class certification and class counsels' efforts to notify him.  They challenge Long's assertion that liability will not be a contested issue at trial.  Although the class plaintiffs assert that they have strong arguments in favor of a liability finding, they maintain that this is still an open question.  They posit that virtually all E-Ferol recipients and their families were completely unaware that the drug had been administered, or that a recall was issued, and thus issues of class members' knowledge would not be difficult to resolve.  The class plaintiffs argue that a class action is a superior method for litigating the case because there are very few medical experts with knowledge of E-Ferol and they would not be able to participate in many discrete lawsuits, and the tort system failed to inform the class members of their claims, resulting in the formation of a sizeable class from uninformed E-Ferol recipients.  Finally, they assert that the potential of a fraudulent concealment defense does not defeat class certification and that bifurcated trials could efficiently dispose of any individualized motions related to damages.

Defendants oppose Long's decertification motion by arguing that the certification requirements of Rule 23 ought to be applied in the context of a proposed settlement where, as here, the parties have made clear that they do not intend to proceed to trial. *See* Ds. Jan. 25, 2010 Resp. 15 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems[.]")). Defendants agree with the class plaintiffs that the issue of liability is not resolved and would be strongly contested if the case were tried. Furthermore, they assert that Long's contentions about individualized issues and mini-trials are misplaced. They contend that, if the proposed settlement is approved, there will be no individualized inquiry into causation of class members' injuries because there will be no trial. Likewise, defendants point out that they will not raise limitations defenses or other related issues if the settlement is approved, which relieves the class of the burden of proving individualized questions of knowledge, reliance, and reasonable diligence. They reason that, because Long's decertification arguments are being raised as objections to the Settlement Agreement (the approval of which would preclude a trial), they constitute "purely hypothetical issues of trial administration." Ds. Jan. 25, 2010 Resp. 17.

The court holds that Long's assertions of defects in the certification of the class are flawed because they are asserted as objections at the settlement stage.  Long opposes approval of the proposed settlement on the ground that the class should be decertified, and he argues for decertification based on potential class-manageability problems that arise at trial.  But if the settlement is approved, it is axiomatic that there will be no class manageability issues at trial——indeed, there will be no trial.  Thus Long is seeking decertification under the guise of objecting to the proposed settlement based on arguments that fall away if the settlement is approved.[29]

The court can approve the proposed settlement if it is fair, reasonable, and adequate to the class as a whole, according to Rule 23(e)(2).  The Fifth Circuit has repeatedly made clear that the district court's decision whether to approve a proposed class action settlement is controlled by the *Reed* factors.  The court agrees with the opinion of Prof. Silver, who notes that, rather than claiming a defect in the Settlement Agreement (the relevant issue in a fairness review), Long essentially seeks to stand in

---

[29]The court recognized in *Klein II* that certification might present problems were the class action to proceed to trial. Although it is not apparent that these problems existed clearly at the time Judge Buchmeyer granted certification, they became known at least by the time defendants moved for partial summary judgment, prior to settlement negotiations.  *See Klein II*, 2008 WL 2152030, at *8-*9.  But because the proposed settlement is being approved, these concerns are longer in play.

*defendants*' shoes when he argues for decertification.  Ps. Ex. 2 at

30.  Prof. Silver explains:

> Courts ordinarily allow litigants to assert
> their own rights, not the rights of opposing
> parties.  In fact, however, Long has not
> asserted that certification of the class for
> litigation violated any of his rights or
> harmed him in any way.  To the contrary, he
> has conceded that class certification helped
> him by enabling Class Counsel to act for him
> and, eventually, to inform him of his claim.
> *The harm (assuming there is one) stems from
> Long's failure to opt out before the deadline
> expired*.  His attack on class certification is
> an attempt to find an argument that might
> succeed if the Court were to reject his demand
> to opt out.

*Id.* (emphasis added).

In the court's view, the procedural peculiarity of Long's

decertification arguments stems from the fact that his objections

on these grounds bear little relevance to the court's analysis of

the proposed settlement under the *Reed* factors.  His arguments do

not allege any unfairness or defect in the Settlement Agreement,

and they do not identify any harm to him or to other members of the

class (other than, possibly, that the class exists at all and that

he is a member).  Indeed, a claim that class members would be

better served through decertification than by approval of the

Settlement Agreement is belied by the fact that 97.3% of the class

members have affirmatively sought approval.  Rather than show how

the alleged certification flaws make the proposed settlement

unfair, Long merely asserts straightforward claims that the case

presents trial-related feasibility issues.   But approval of the settlement eliminates his trial-related decertification arguments.

Long's objections overall——and particularly those framed as decertification arguments——have the appearance of being unabashed attempts to derail the settlement in hopes of somehow finding a way to extricate himself from the class.   But "[t]he court has already denied Long's request to opt out, and it declines to cover the same ground under the guise of Long's 'objections' to the proposed settlement." *Klein v. O'Neal, Inc.*, 2010 WL 234806, at *4 (N.D. Tex. Jan. 21, 2010) (Fitzwater, C.J.).   Long does not show how the certification objections, if valid, are relevant to the court's analysis of the Settlement Agreement.[30]   The court is therefore left with the conclusion that Long's arguments are essentially a last-ditch effort to achieve opt out.   Because his objections do not relate to the fairness, adequacy, or reasonableness of the Settlement Agreement to the class as a whole, they are overruled.

E

Finally, Long objects to the Settlement Agreement's provision that, if the court approves the settlement but its decision is

---

[30]The court is not suggesting that a member of a plaintiffs class could never object to a proposed settlement based on flaws in class certification.   But for any such objection to have relevance in a fairness review, the member must attempt to demonstrate that the flaws in certification somehow render the proposed settlement unfair, inadequate, or unreasonable to the class as a whole. Without speculating on what could constitute such a showing, the court finds that Long's decertification objections fail to meet this relevance standard.

appealed, defendants are not obligated to fund the settlement until the case is finally resolved.  Long requests that defendants be ordered to place the funds in an escrow account immediately upon court approval.  He contends that, if defendants are permitted to retain the settlement funds pending an appeal, the class members will lose interest that would accrue in the interim.  The court overrules this objection.

The court cannot approve some parts of a proposed settlement and reject others.  It must decide whether the Settlement Agreement as a whole is fair, reasonable, and adequate.  And it must "consider the effect of the settlement as a whole," and it cannot "delete, modify or substitute certain provisions."  *Cotton*, 559 F.2d at 1331.  "The settlement must stand or fall as a whole."  *Id.* at 1332.

Moreover, Long has failed to demonstrate that the payment provisions of the Settlement Agreement prevent the proposed settlement from being fair, reasonable, and adequate to the class as a whole.  Given the overwhelming support for the proposed settlement by the other class members and defendants, if there is any delay in payment due to an appeal it will be due to an appeal that Long files.  Even if this were not so, the court would find that the objection is insufficient of itself to warrant disapproving the proposed settlement.

F

For the foregoing reasons, the court overrules Long's objections to the Settlement Agreement.[31]

V

Before the class plaintiffs and defendants reached their agreement on the proposed settlement, Long filed two other motions that the court now addresses: a motion for decertification of the class, and a motion to intervene[32] and renewed motion for leave to opt out.

Long argues that he should be allowed to intervene as a plaintiff rather than remain a class member. He seeks to intervene as a means of preempting arguments by the class plaintiffs and defendants that, as a class member, he does not have standing to bring his motion for decertification. As a named plaintiff, Long would have standing. He asserts in a footnote that he "does not accept class counsel's objection [that Long lacks standing to bring the decertification motion] and maintains that, as a class member, he has appropriate standing." Long Mot. Intervene 2 n.1. He does

_____

[31]Long has also objected to the award of attorney's fees requested by counsel for the class plaintiffs. These objections are not germane to the overall approval of the settlement; they relate only to the motion for attorney's fees. Accordingly, the court overrules Long's objections on these grounds *infra* at § VII when deciding the motion for attorney's fees.

[32]The motion to intervene is contingent on the proposed settlement's including a prohibition on class members opting out. Because the settlement contains such a prohibition, the motion remains to be decided.

not, however, support this assertion beyond this conclusory footnote.  Moreover, in his reply brief in support of his motions for decertification and to intervene,[33] Long presents little, if any, argument in support of his standing to bring a decertification motion.  In their responses to Long's motions, the class plaintiffs and defendants argue that Long——as a member of the class——lacks such standing.

Long's motion to intervene concedes that no available legal procedure exists that would enable the court to grant him leave to intervene as a named plaintiff.  He admits that the supplemental jurisdiction statute, 28 U.S.C. § 1367(b), facially prohibits intervention because he and Retrac are both citizens of Ohio and therefore complete diversity does not exist.  Under the law at the time the case was commenced, each named plaintiff was required to be completely diverse from each named defendant.  Furthermore, as a non-diverse party, Long admits that, if § 1367(b) "is applied according to its literal wording,"[34] he cannot take advantage of Rule 24.  Long Mot. Intervene 3.

Foreclosed from intervening, and thereby lacking standing to bring his motion for decertification, Long asserts that his position presents a "constitutional due process problem because

---

[33]Long filed a single reply brief in support of both motions.

[34]Apart from his due process objections discussed below, Long does not suggest any plausible reason for the court to apply § 1367(b) other than according to its plain meaning.

non-diverse class members such as Long in class actions commenced before [enactment of the Class Action Fairness Act of 2005] are precluded from participating directly in a case where their substantial rights are being determined." *Id.* Long concludes that, notwithstanding the clear prohibition of § 1367(b), he should be permitted to intervene because any other result would violate his due process rights. Alternatively, he argues that the court could cure this constitutional problem by refusing to approve the settlement unless a second opt out is allowed under Rule 23(e)(4). Long's reply brief summarizes his prior arguments in support of decertification, states that the question of decertification is properly before the court (by reason of Long's inclusion of the issue in his formal objections to the Settlement Agreement),[35] and renews his assertion that he should be allowed to opt out of the class (an issue also raised in his settlement objections).

In summary, Long brings motions for decertification and for leave to intervene. But he essentially concedes that he does not have standing to bring his decertification motion, and he further admits that there is no legal mechanism that would permit him to

---

[35]Long also argues in his motion for decertification that, if the Settlement Agreement is approved and he exercises his right to appeal, he will have standing as an objecting class member to raise the issue of certification on appeal. The court assumes *arguendo* that Long's position is correct. Long's objections on these grounds are overruled, however, because his decertification arguments fail to demonstrate (or even address) whether the Settlement Agreement is fair, reasonable, and adequate to the class as a whole, as set forth *supra* at § IV(D).

intervene in the case in order to gain standing.  Instead, Long relies on arguments that his request for decertification is properly before the court via his settlement objections and that his inability to intervene supports the conclusion that constitutional due process rights mandate that he be allowed to opt out.  He states in his reply brief that "while [he] is not withdrawing these motions, the same issues in substance are also before the Court as a part of [his] Objection to the proposed class settlement agreement."  Long Reply Br. 3.

The court denies Long's motion for decertification to the extent that such denial is necessary, and it does so for the same reasons as are set out *supra* at § IV(D).  Because Long sought to intervene solely to establish standing to bring his motion for decertification, the court's decision not to decertify the class may moot his intervention request.  But assuming that he has standing and considering the merits of the motion, the court holds that Long has pointed to no legal grounds that would allow him to intervene in the case, and his brief offers no compelling reason to find constitutional error.  The court therefore denies the motion. And for the reasons explained *supra* at § IV(B), the court also denies Long's renewed request to opt out.[36]

---

[36]Because of the court's disposition of Long's motions and objections, it need not decide defendants' February 4, 2010 motion to exclude and to strike documents and other materials proffered by Long in support of his objections to the class settlement and defendants' February 10, 2010 motion to exclude expert reports

VI

Accordingly, for the foregoing reasons, the court approves the Settlement Agreement and finds that it is fair, reasonable, and adequate to the class as a whole.  The court's analysis of the *Reed* factors demonstrates that the proposed settlement adequately compensates each class member based on the strength of the member's case.  The allocation of damages among the various categories is fair, reasonable, and adequate.  Approval of the Settlement Agreement is affirmatively supported by 97.3% of the class members. Against this overwhelming group of supporters stands a lone objector whose objections are animated primarily by his desire to litigate his claims individually and against additional parties. Concluding that the proponents of the settlement have met their burden of proof, and finding no persuasive reason to deny approval, the court approves the Settlement Agreement.

VII

Class counsel move for an award of attorney's fees pursuant to Rule 23(h)(1).  They request (1) a fee award of 30% of the settlement amount, to be distributed among the attorneys for the class according to a fee sharing agreement; (2) reimbursement of reasonable and necessary expenses associated with the litigation; (3) $300,000 to be withheld from the settlement amount to pay for

---

proffered by Long and Jenkins.  These motions are therefore denied as moot.

costs of administration and distribution of the settlement proceeds; and (4) $75,000 for each of the two class representatives as compensation for their efforts in representing the class over the course of the litigation.

A

Class counsel undertook representation in this case under a contingent fee agreement, and no fee-shifting statute applies. Therefore, any award of attorney's fees and costs will come from the common fund obtained for the class plaintiffs through the settlement. The proposed Settlement Agreement calls for the fees and costs to be deducted from each class member's recovery amount on a pro rata basis. Long objects to the requested fee. As with the proposed settlement, the other class members do not oppose class counsels' motion for fees and expenses.

Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." "In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008). "[T]o fully discharge its duty to review and approve class action settlement agreements, a district court must assess the

reasonableness of the attorneys' fees." *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). Furthermore, "the duty to investigate the provisions of the suggested settlement includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services." *Id.* (internal quotation marks omitted). "The Court must carefully scrutinize the attorneys' fee award in a common fund settlement because the interests of the attorneys conflict with those of the class." *In re OCA, Inc. Sec. & Derivative Litig.*, 2009 WL 512081, at *17 (E.D. La. Mar. 2, 2009). Because it has an independent duty to review the fee request in the interests of protecting the class, "a district court is not bound by the agreement of the parties as to the amount of attorneys' fees." *Strong*, 137 F.3d at 849 (internal quotation marks omitted).

The use of a common fund to pay attorney's fees in class action settlements is well established. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."). But while the use of a common fund approach to attorney's fees is accepted, the method of calculating those fees can vary. In this case, the class plaintiffs request that the court use a "percentage" method of calculating fees, in which the

court determines an appropriate percentage of the overall recovery to award as a reasonable attorney's fee. *See Schwartz*, 2005 WL 3148350, at *25. Long counters that the only acceptable method of calculating the fee in the Fifth Circuit is to use the lodestar method, which multiplies a reasonable hourly rate by the number of hours reported by counsel to arrive at the "lodestar." *See, e.g., Strong*, 137 F.3d at 850. Regardless which method is used, the court should check the resulting fee against the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), to test the reasonableness of the fee and make adjustments as warranted by the circumstances.[37] *See Schwartz*, 2005 WL 3148350, at *28. In cases unlike this one——that is, cases involving fee-shifting among parties and not involving a common fund——the lodestar method is still preferred by courts. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 801-02 (2002).

"The law of the Fifth Circuit as to which of the two methods should be employed in common fund cases is at best unclear." *In re*

---

[37]The familiar *Johnson* factors are (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable;" (11) the type of attorney-client relationship and whether that relationship was long-standing; and (12) awards made in similar cases. *Johnson*, 488 F.2d at 717-19.

*Combustion, Inc.*, 968 F. Supp. 1116, 1134 (W.D. La. 1997).   The Fifth Circuit has yet to definitively endorse the percentage method as a means of calculating fees in class action settlements, but numerous district courts in this circuit have applied the percentage method in common fund cases. *See, e.g.*, *In re OCA, Inc. Sec.*, 2009 WL 512081, at *18 ("The Fifth Circuit has never explicitly disapproved of the percentage method of calculating fees in common fund cases."); *Schwartz*, 2005 WL 3148350, at *25 (collecting cases); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F.Supp.2d 942, 967 n.15 (E.D. Tex. 2000) ("[T]he Fifth Circuit has never . . . reversed a district court judge's decision to award a fee as a percentage.").   The *Manual for Complex Litigation* identifies the Fifth Circuit as the only circuit that has yet to explicitly adopt the percentage method. *Manual for Complex Litigation (Fourth)* § 14.121 (2010) (stating that Fifth Circuit "seems to allow considerable flexibility in approving combined percentage and lodestar approaches").   The Fifth Circuit has affirmed, however, a district court's use of the percentage method in conjunction with an analysis of the *Johnson* factors.   *See Longden v. Sunderman*, 979 F.2d 1095, at 1100 n.11 (5th Cir. 1992). But it has also stated in the recent case of *In re High Sulfur* that "[t]his circuit requires district courts to use the 'lodestar method' to assess attorneys' fees in class action suits." *In re High Sulfur*, 517 F.3d at 228 (citing *Strong*, 137 F.3d at 850).

- 86 -

District courts have noted, however, that *Strong* and *In re High Sulfur* are not completely on point because the panel in *Strong* explicitly noted that the case did not involve a common fund. *See Strong*, 137 F.3d at 852 (distinguishing Supreme Court's approval of percentage fee in *Boeing* because "no fund was established at all in this case."); *see also In re OCA, Inc. Sec.*, 2009 WL 512081, at *18. Moreover, the dispute in *In re High Sulfur* involved a district court's distribution of the overall fee award from the common fund among a number of plaintiff attorneys. Thus the question of how the underlying fee itself should be determined was not at issue.

Because of the lack of clarity, district courts have concluded that, "though the Fifth Circuit has not explicitly accepted the percentage method, it does appear to be amenable to its use, so long as the *Johnson* framework is utilized to ensure that the fee awarded is reasonable." *Turner*, 472 F.Supp.2d at 860 (citations omitted). To account for the Fifth Circuit's preference for a *Johnson* analysis, "numerous district courts in this Circuit have primarily applied a 'blended' percentage method to determine a reasonable fee award." *Id*. The "blended" method, sometimes referred to as the "hybrid" method, uses the percentage method to establish a benchmark fee and then checks this amount against a reasonableness test based on consideration of the *Johnson* factors. *See Shaw*, 91 F.Supp.2d at 968. The benchmark percentage can be

adjusted up or down on this basis.  Such an approach respects the Fifth Circuit's preferences, given that the circuit "has affirmed a court's calculation of fees based on the percentage method when the court also considered the *Johnson* factors, noting the judge's use of the percentage method merely demonstrated his preference 'as a matter of policy.'"  *In re OCA, Inc. Sec.*, 2009 WL 512081, at *18 (citing *Longden*, 979 F.2d at 1100 n.11).

To avoid deciding whether to follow one method over the other, the court will decide the fee application under both the percentage and the lodestar methods.  The court will first examine the request for attorney's fees under the percentage method, coupled with a *Johnson*-based cross-check.  This is the method endorsed by lead class counsel Brender in his fairness hearing testimony.  *See* Tr. 1:166 (testifying that percentage method should be employed, but stating that "a *Johnson vs. Georgia Highway Express* check is [appropriate].").  The court will then calculate the lodestar amount and apply the *Johnson* factors to provide a comparison to the result reached under the percentage method.  *See In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 444 (S.D. Tex. 1999) (using the lodestar to cross-check a fee calculated under the percentage method).

B

Class counsel request a fee award of 30% of the total settlement amount, which represents $27 million.[38]  The *Manual for Complex Litigation* states that "[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund." *Manual for Complex Litigation (Fourth)* § 14.121 (2010).  It notes, however, that "in 'mega-cases' in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate." *Id.* (noting that, in cases with common funds in excess of $100 million, one survey found awards from 4.1% to 17.92% were typical).  One published study of reported class action attorney's fee awards concludes that, in settlements with amounts similar to the one here, courts should typically find the request reasonable with little second guessing if it falls between 17.6% and 26.8% of the common fund.  Moreover, fee requests that fall between 26.8% and 36% percent should be considered potentially reasonable, provided there is some affirmative justification for the figure. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 1, 37-38 (2004).  "If the request is

---

[38]The attorneys state that, if the class succeeds in obtaining the additional $20 million in insurance proceeds that are not part of the Settlement Agreement, they will submit a separate fee application.

relatively close to the average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award." *Id.* at 36.

A review of other cases reveals that a fee request of 30% of a common fund, although on the high end, is within the range of reasonableness for settlements of this size. *See, e.g., Turner*, 472 F.Supp.2d at 867 (awarding attorney's fees of 17% of $195 million recovery); *Schwartz*, 2005 WL 3148350, at *27 ("The requested fee award of 22.2% of the [$149.75 million] Settlement Fund is consistent with and, in fact, significantly less than awards made in similar cases."); *In re Combustion, Inc.*, 968 F. Supp. at 1142 (approving 36% fee based on $127 million settlement fund). In a typical case, the court might be persuaded that, for a settlement of $90-$110 million dollars, the appropriate percentage benchmark is approximately 25%, which would fall within the "presumptively reasonable" range identified by Eisenberg and Miller. A benchmark of 25% acknowledges the pattern in class action settlements with greater overall recoveries, as here, which typically involve more modest percentages than are found in smaller common-fund settlements. As the court will explain, however, this initial benchmark does not take into account the unique circumstances of this case that merit an increased fee. These circumstances are examined through the court's analysis of the *Johnson* factors.

- 90 -

C

The court next considers counsels' request under the *Johnson* factors to determine whether a deviation from the benchmark percentage range is appropriate and to test the overall reasonableness of the fee. The court will analyze each relevant factor separately and will then consider what deviation from the benchmark percentage, if any, is warranted based on all the factors considered together.

"The court must scrutinize the agreed-to fees under the standards set forth in [*Johnson*], and not merely ratify a pre-arranged compact." *Strong*, 137 F.3d at 849 (internal quotation marks omitted). The court's analysis under *Johnson* must not be merely conclusory, but must establish grounds for the court's decision on each of the relevant factors. "If the district court has articulated and clearly applied the correct criteria, we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *In re High Sulfur*, 517 F.3d at 228-29. "Even though it is apparent that the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered." *In re Combustion, Inc.*, 968 F. Supp at 1135. The court sets forth its reasoning below, but it incorporates into this discussion its findings regarding counsels' efforts and the

challenges presented by this litigation, as discussed *supra* at § III regarding the motion for approval of the Settlement Agreement.

The first factor the court considers is the time and labor required by the attorneys in litigating the case. Counsels' billing records demonstrate the substantial and consistent workload that the litigation required. During the course of providing exceptional representation for the class plaintiffs, counsel attempted to obtain all the required medical records and to individually contact each E-Ferol recipient or the recipient's survivors. The age of the 20-year old medical records and the recalcitrance of many hospitals to reveal the names of E-Ferol recipients made these efforts more challenging and time consuming than in a typical class action, and they sometimes involved contested proceedings to obtain records. In addition to the large volume of typical pretrial work, counsel sought and obtained class certification, successfully defended a petition for leave to appeal that ruling, opposed defendants' partial summary judgment motion, and engaged in extensive settlement negotiations. The issues in the case——as reflected by the expert testimony at the fairness hearing——were complex, and counsel were required to prepare themselves in complicated matters in order to represent the class effectively. The investment of time and effort by counsel is underscored by the fact that this litigation has stretched on for

seven years, with relatively few periods of inactivity.

The legal experts testified that the volume of the docket entries in this case stood out as particularly heavy when compared with typical class actions. Prof. Underwood testified that he reviewed the significant motions and pleadings in the case and found that the case was notably more intensive than most suits of this type: "a lot of class actions [a]re handled differently from this one." Tr. 1:238. He concluded that "this was hard fought litigation, the gloves were off. This was a big case[.]" *Id.* Likewise, Prof. Silver notes in his declaration that one study found that the typical non-securities class action case lasted from one to four years, whereas the instant litigation has lasted nearly seven. *See* Ds. Ex. 2 at 10. The time and labor required in this case justify an increase in the benchmark percentage fee that might otherwise be considered presumptively reasonable.

The next factor the court considers is the novelty and complication of the issues presented in the case. This litigation has presented challenging legal questions (i.e., limitations defenses, causation of death or injury, fraudulent concealment, and multi-tiered insurance coverage). Given the evidence and the length of time that elapsed since the events in question occurred, counsel were required to address legal issues that involved considerable research into the facts and applicable law (law that sometimes varied by state). Although E-Ferol cases had been

- 93 -

litigated before this class action was filed, and defendants' liability for injuries and the medical data surrounding some of the claims were somewhat well developed, class counsel were still required to expand on this foundation. Moreover, the complicated legal questions surrounding statutes of limitations and repose, as well as issues of reasonable reliance by class members, that arose in this case were not present in the prior E-Ferol cases.

The court also considers the testimony of the medical experts at the fairness hearing, and their pre-hearing submissions, about the complexity of the medical causation issues. Experts for both sides opined that there was uncertainty surrounding the medical evidence supporting the class plaintiffs' claims. Because the community of medical experts with knowledge about E-Ferol is narrow, class counsel were required to retain the handful of specialists with sufficient understanding to analyze the medical records. Moreover, as stated above, even obtaining these records proved to be arduous, often requiring collateral litigation. The expert testimony focused heavily on the disputed causation arguments in the case. Because the class includes not only death claims but also claims for neurological injuries and medical monitoring, the burden of proving that E-Ferol caused the claimed injuries is more difficult in this case than in many of the previous E-Ferol lawsuits. The volume of discovery and pretrial practice in this case, along with the duration of the litigation,

confirms the complexity of the issues faced by class counsel.  The court finds that the complexity of the issues also favors an increase in the benchmark percentage.

The court next considers the extent to which class counsel were precluded from accepting other work due to the responsibilities involved in litigating this case.  Each lawyer averred that this case precluded him from accepting other engagements.  Lead counsel Brender pointed to his billing records, which reflect that work on this litigation has often been a daily routine throughout the life of the case.  The reported hours demonstrate that work on other cases was often precluded. Likewise, the lawyers from the Dent Law Firm submitted billing records that show the demands that this case made on them.  They also averred that at least 20 complex litigation cases were turned away to permit time to prosecute this action.  The court recognizes that, not only has this case required significant, almost weekly investments of time (to the exclusion of other employment), but the investment has been required over a period of seven years.  The decision to represent the plaintiffs class required a strong commitment and resulted in the loss of other work.  Accordingly, the court finds, under the circumstances presented here, that this factor favors an increase in the typical benchmark level.

Next, class counsel represented the class on a contingent-fee basis, with no guarantee of any recovery.  Not only did they

represent plaintiffs who likely could not otherwise have afforded counsel, they funded more than $1.8 million in litigation expenses, incurring many of these costs before they were aware that the class plaintiffs would realize any recovery.  The contingent nature of the fee favors an increase in the typical benchmark percentage.[39]

The court considers last the amount involved and the results obtained.  In this case, the results obtained for the class are significant: $90 million dollars in settlement funds and the possibility of another $20 million if ongoing insurance disputes are favorably resolved.  Notably, this is not a case where a large sum is being recovered but the class is so numerous that each individual is receiving only a token payment.  On the contrary, the allocation of this settlement fund means that plaintiffs in Categories 1, 2, and 3 will receive between $1 million and $2 million apiece, before attorney's fees and expenses are deducted, and even claimants without identifiable injuries or whose claims have been dismissed on limitations grounds will receive payments.  These recoveries are significant and have been shown to compare favorably with the likely results even if the class members' cases

---

[39]In some circumstances, this *Johnson* factor cannot be considered.  *See Burlington v. Dague*, 505 U.S. 557, 567 (1992).  But because this is a common fund case, the court is not precluded from considering it.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 791 (S.D. Tex. 2008) ("the holding in [*Dague*] that enhancement of the lodestar by a multiplier based on the contingent nature of a fee is not allowed when fees are awarded to plaintiffs' counsel under fee-shifting provisions of statutes, does not apply to common fund cases.").

were tried individually.  Moreover, the attorneys point out that, not only is the monetary recovery significant, this lawsuit provided the first notice for many recipients or their survivors about the effects of E-Ferol, and it provided answers to previously unexplained injuries and deaths.  These intangible benefits are real and valuable, even if they cannot be readily valued monetarily.  For the foregoing reasons, the court finds that the amount involved and the recovery obtained for the class merit an increase from the typical benchmark percentage.

D

Based on its examination of the *Johnson* factors, and considering the risks involved in counsels' representation of the class, the court finds that a percentage award of 30% is reasonable.[40]  The court is particularly impressed with the size of the recovery obtained for the class and the fact that this sum is divided among a relatively small number of class members, so that individual recoveries are substantial in most categories.  Although courts sometimes award class action attorney's fees at a percentage that is lower than 30%, class actions often involve so many class members that the individual shares of the payout are highly diluted.  Fortunately for this class, this is not the case here.

---

[40]The court has fully considered each of the *Johnson* factors, although it has not explicitly addressed each one.  Any factor not mentioned is found to be inapplicable to the court's determination of the reasonableness of the fee and to have no impact on adjusting the typical benchmark percentage fee upward or downward.

Additionally, the volume of work required and the seven-year life span of the case mean that each lawyer was required to invest more effort and time than is typically required of attorneys representing a class.

Furthermore, the testimony at the fairness hearing establishes that the requested 30% fee is reasonable and is actually less than might be expected given the duration of the case and the risks involved. Noting the vast support from the class,[41] Prof. Underwood opined that "[y]ou could almost say in a case like this that the traditional need for court supervision and approval is largely unnecessary." Tr. 1:247.   In his pre-hearing declaration, Prof. Underwood averred that, "[f]rom my experience defending personal injury tort claims, a contingent fee of 30% would be on the low end of the spectrum as I have tended to see contingency fee arrangements in such cases typically ranging from 33% to 50% . . . ." Ps. Ex. 28 at 18.  These percentages tend to increase "as the case takes on greater complexity and is further along in the

_____

[41]Notice of the 30% fee request was included along with the notice of the Settlement Agreement sent to each class member. Ninety-seven percent of the class members responded with affirmative requests that the court approve the settlement; no members of the class (other than Long) oppose the fee request, although they are entitled to do so under Rule 23(h)(2).  Class members who are otherwise satisfied with the amount of their pro rata recoveries could reasonably be expected to object to a 30% deduction if they considered this percentage to be excessive. The absence of any complaint from all but one member of the class underscores the court's finding that a 30% fee request is reasonable.

procedural posture of the case." *Id.* Finally, even defendants'
counsel opposes Long's objections to the fee request, opining that
"[c]lass Counsel in this case have had to perform more work than
most attorneys in class actions. The zealous representation on
both sides has culminated in a compromise viewed as fair,
reasonable, and adequate by lead counsel with over seventy years
combined experience." Ds. Feb. 14, 2010 Resp. 17-18.

E

The court now cross-checks its finding by analyzing the
request under the lodestar method. *See Shaw*, 91 F.Supp.2d at 968.
Under this method, the court takes the recorded hours worked by the
attorneys and multiplies them by a reasonable hourly rate. *See,*
*e.g., Forbush v. J.C. Penny Co.*, 98 F.3d 817, 821 (5th Cir. 1996).
The resulting lodestar amount may then be adjusted upward or
downward depending on the court's application of the *Johnson*
factors. *See id.*

Counsel provided records of billable hours expended on this
litigation from 2003 through 2009; the total of all three
attorneys' time is approximately 22,032 hours. This time does not
include work done in the first three months of 2010, during which
the fairness hearing took place and numerous pleadings and briefs
were filed. To account for the attorneys' time worked since
December 2009, the court will add 250 hours to the total of all
three attorneys (which is probably conservative). This results in

a total recorded time of 22,282 hours.   The court has not
meticulously analyzed the reported hours line-by-line, but it has
generally reviewed the submitted hours, and they appear to be
reasonable.   Long does not contend that the submitted hours are
unreasonable.   In fact, he maintains that any fee award should be
made on this basis.[42]   Moreover, the evidence at the fairness
hearing was that the hours reported are reasonable.   Prof.
Underwood testified that he was not surprised at the number of
reported hours—based on the duration and complexity of the
case—and that a similar number of hours would be necessary to
effectively prosecute a class action such as this one.   *See* Tr.
1:228-29.

    The attorneys have provided suggested figures to use as
reasonable rates for the lawyers' time.   Brender avers in a
discovery response that, during the pendency of this litigation, he
has worked on only one case with an hourly billing arrangement (the
majority of his work is on a contingent-fee basis).   In that case,
he billed at the rate of $500 per hour.   The lawyers from The Dent
Law Firm state that, had they entered into this representation with
an hourly billing arrangement, they would have charged $600 per
hour, based partially on their valuable experience having litigated

---

[42]Although Long asserts that the requested 30% fee is excessive
and maintains that the lodestar method is the only acceptable means
of calculating a fee, he does not raise any specific objections to
the hours reported by class counsel.

prior E-Ferol cases.  They also aver that any fee award under the lodestar method should be calculated with a multiplier of at least 2.

"The Fifth Circuit has noted that a court is itself an expert in attorneys' fees and 'may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment with or without the aid of witnesses as to value.'" *In re OCA, Inc. Sec.*, 2009 WL 512081, at *25 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).  Based on its knowledge of the reasonable rates charged by attorneys of similar experience and ability as those here, the court finds that $500 per hour is a reasonable average rate to apply to all three lawyers for the class.  Taking this as a reasonable hourly rate and multiplying it by the number of hours worked, the resulting lodestar fee is $11,141,000 (i.e., $500 per hour x 22,282 total hours).

The court next considers whether the lodestar should be adjusted based on its analysis of the *Johnson* factors.  "The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, i.e., to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 751 (S.D. Tex. 2008) (internal quotation marks omitted).  The court concludes that an

upward adjustment under *Johnson* is merited for the same reasons that it concludes that an increase in the percentage benchmark fee is appropriate.  Applying a multiplier of 2.5 results in a fee award of $27,852,500 (i.e., 2.5 x $11,141,000).  Multipliers in this range are not uncommon in class action settlements.  *See, e.g., Forbush*, 98 F.3d at 824 (affirming district court's use of multiplier of two); *Vaughn v. Am. Honda Motor Co.*, 627 F.Supp.2d 738, 751 (E.D. Tex. 2007) (applying a multiplier of 2.26); *Turner*, 472 F.Supp.2d at 869 ("[T]he Court finds that a lodestar multiplier range of 2.5 to 3.5 would be appropriate and reasonable in this case."); *In re Combustion, Inc.*, 968 F. Supp. at 1133 ("Multipliers ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied."); *Garza v. Sporting Goods Props., Inc.*, 1996 WL 56247, at *33 (W.D. Tex. 1996) ("The range of multipliers in large and complicated class actions have ranged from 2.26 to 4.5.").  The court finds that a multiplier of 2.5 would be warranted due to the risks entailed in this lawsuit and the zealous efforts of the attorneys that resulted in a significant recovery for the class.  This comports with the testimony of Prof. Underwood, who opined that, in cases such as this one, "[i]t's not uncommon for courts to use multipliers of 2 or 3."  Tr. 1:251 ("[Y]ou could argue for a greater multiplier here, given all the unique challenges of this case and the fact that it took you seven years to reach a settlement, the prospects

for getting paid were arguably slimmer, and the percentage of [the attorneys'] time . . . was much greater[.]").  The result under this lodestar cross-check results in an award of attorney's fees that is slightly greater than the award of 30% of the common fund (i.e., $27,000,000 vs. $27,852,500).[43]  Accordingly, the court finds that counsels' request for an attorney's fee award equaling 30% of the class recovery is reasonable, and it is therefore approved pursuant to Rule 23(h)(1).[44]

F

The court overrules Long's remaining objections to the motion for award of attorney's fees.

Long requests that the court apply a pure lodestar calculation rather than the percentage method.  The court disagrees, for the reasons explained above, that strict adherence to the lodestar method alone is required.  Long also asks that the court exempt from his portion of the approved settlement any attorney's fees for

---

[43]The attorneys have submitted a fee sharing agreement that states a division of the overall attorney's fee as follows: lead counsel Brender 45%; Dwain Dent 40%; Fred L. Strek, III 15%. "[L]ead plaintiff and lead counsel's decision that non-lead counsel is entitled to some compensation is entitled to deference, although the Court must still independently review it."  *In re OCA, Inc. Sec.*, 2009 WL 512081, at *23.  The court finds that the proposed fee-splitting arrangement is reasonable and approves the agreed divisions.

[44]Consistent with the stated intentions of the attorneys, if class counsel succeeds in obtaining additional insurance recoveries through litigation against Federal, Westchester, or Mission following the approval of the Settlement Agreement, counsel can apply for an additional fee award.

actions that Long posits were against his personal interest.  He reiterates vague accusations that the elements of the Settlement Agreement with which he disagrees are targeted at him, and he complains that he should not be required to pay fees for representation that resulted in such terms, or for class counsels' work in defending against his objections.  The court also overrules these objections.

The work of class counsel, for which they are being awarded a 30% fee, resulted in a substantial recovery for the class as a whole.  Lead counsel for both sides, the legal experts who provided evidence, and even Long's attorney agreed that class counsel had diligently worked on behalf of the class through the prolonged life of this litigation.  Although Long may be dissatisfied with parts of the Settlement Agreement and his individual recovery, it is indisputable that the only reason he is recovering a substantial sum under Category 1 is due to the commendable work of class plaintiffs' counsel.  It is reasonable, therefore, for attorney's fees to be paid out of Long's portion, which is the product of counsels' efforts.  Long's dissatisfaction with the proposed settlement does not mean that he can enjoy the benefits without the corresponding obligation to compensate the attorneys who zealously and capably worked to obtain a recovery on his behalf.  The fact that some of counsels' efforts were aimed at opposing his challenges to the proposed settlement does not alter the court's

conclusion.  Class counsel succeeded in procuring a sizeable award for Long and the class as a whole.  It was necessary that they oppose his objections to ensure that the settlement was approved. They are entitled to be fairly and reasonably compensated for their services in securing approval of a proposed settlement that is fair, reasonable, and adequate to the class as a whole.

G

In addition to the 30% fee award, the court approves class counsels' request for compensation of expenses incurred in the course of litigation.  The court has reviewed the claimed expenses and finds that they are reasonable.  Credible evidence was presented at the fairness hearing that the expenses submitted are reasonable and that they are even less than might be expected, particularly considering the volume of 20-year old medical records that class counsel were required to assemble and analyze.  Prof. Underwood has reviewed class counsels' expense reports, and he sees "no items on those expense statements that appear inappropriate or excessive." Ps. Ex. 28 at 18.  He applauds the attorneys' decision to seek reimbursement for the actual costs of outside consultants rather than at marked-up rates.  He concludes that, "[i]f anything, the amount of these expenses is low." *Id.* at 19.  The court approves reimbursement for the expenses submitted in the original December 28, 2009 motion for attorney's fees, as well as the supplemental list of expenses submitted in class counsels' February

24, 2010 letter to the court.

The court also approves the request for $300,000 to be set aside to cover expenses associated with the administration and distribution of the settlement funds to the class. There is no basis in the record to find that this expense is unreasonable or that class counsel should not be compensated for it. Any part of the $300,000 remaining after the settlement funds have been distributed will be allocated pro rata among class members according to the categorical percentages under the Settlement Agreement.

Finally, the court approves payments of $75,000 each for the two class representatives, Victoria Klein and Ashley Swadley. Given the duration of the litigation and the extent of their personal participation, both named plaintiffs are entitled to compensation above and beyond their recoveries under the Settlement Agreement[45] for their services to the class as a whole.

As with the 30% attorney's fee award, no class member (except Long) objected to any of the requests the court is approving in § VII(G). To the extent that Long specifically objects to these requests, his objections are overruled.

_____

[45]Both named plaintiffs are in Category 4. The court finds that their efforts on behalf of the class members, many of whom will receive much larger recoveries under the Settlement Agreement than they, merit such compensation.

*     *     *

For the foregoing reasons, the class plaintiffs' February 8, 2010 motion to approve class settlement is granted, and their December 28, 2009 motion for award of a reasonable attorney's fee, expenses, and costs, compensation for class representative, and administrative costs is granted. Long's September 23, 2009 motion to intervene and renewed motion to opt out and motion for decertification of the plaintiffs class are denied. Defendants' February 4, 2010 motion to exclude and to strike documents and other materials proffered by Lawrence V. Long, Jr. in support of his objections to the class settlement and their February 10, 2010 motion to exclude expert reports proffered by objectors Lawrence V. Long, Jr. and Sharon Jenkins are denied as moot.[46]

Within 30 days of the date this memorandum opinion and order is filed, counsel for the class plaintiffs and defendants must file proposed documents for the court's consideration and entry to effect the approved settlement and the entry of a final judgment, as contemplated by Rule 58. Documents filed after the fairness

---

[46]Additionally, in view of the approval of the settlement, the following motions are also denied without prejudice as moot: (1) defendants' May 9, 2008 motion to enforce scheduling order; (2) defendants' May 22, 2008 motion to limit designation of class membership; (3) plaintiffs' June 4, 2008 motion to stay designation of plaintiff's experts on general causation in compliance with Fed. R. Civ. P. 26(a)(2) and defendants' motion to limit designation of class membership; and (4) defendants' June 23, 2008 motion for entry of order certifying interlocutory appeal under 28 U.S.C. § 1292(b).

hearing but before the filing of this memorandum opinion and order need not be duplicated.  It will assist the court if the parties will also advise the court by letter of all matters that await court action and, if pleadings have been filed concerning these matters, identify them by docket number.

**SO ORDERED.**

April 9, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE