IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| VICTORIA KLEIN, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 7:03-CV-102-D |
| VS. | § | (Consolidated with |
| | § | Civil Action No. 7:09-CV-094-D) |
| FEDERAL INSURANCE CO., | § | |
| a/k/a CHUBB GROUP OF | § | |
| INSURANCE COMPANIES, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this insurance coverage dispute between the plaintiffs in a certified class action involving the administration of the vitamin E supplement E-Ferol Aqueous Solution ("E-Ferol") and defendant Federal Insurance Co. ("Federal"), an excess liability carrier, both parties move for summary judgment. For the reasons that follow, the court concludes as a matter of law that the negligent conduct of one of the insureds is covered under the relevant insurance policy and grants the class plaintiffs' motion for summary judgment on the question of insurance coverage. The court concludes, however, that, under Ohio law, the class plaintiffs are not entitled to recover their attorney's fees from Federal. Accordingly, the court grants in part and denies in part both motions for summary judgment, and it enters a Fed. R. Civ. P. 54(b) final judgment today in favor of the class plaintiffs.

I

This case is the subject of several prior memorandum opinions and orders.[1]  The court will therefore recount only the background facts[2] and procedural history that are pertinent to this decision.

The class plaintiffs are members of a certified class of persons, or the legal representatives of persons, who, during the period from November 1, 1983 until April 30, 1984, were administered E-Ferol and died or were injured as a result ("the class plaintiffs" or the "E-Ferol Class").  *Klein v. Fed. Ins. Co.*, 2014 WL 239652, at *1 (N.D. Tex. Jan. 22, 2014) (Fitzwater, C.J.) ("*Klein V*").  In 2003 the class plaintiffs sued, among others, Revco D.S., Inc. ("Revco")[3] and Revco's wholly owned subsidiary, Carter-Glogau Laboratories,

---

[1]*See, e.g., Klein v. Fed. Ins. Co.*, 2014 WL 4476556 (N.D. Tex. Sept. 11, 2014) (Fitzwater, C.J.); *Klein v. Fed Ins. Co.*, 2014 WL 239652 (N.D. Tex. Jan. 22, 2014) (Fitzwater, C.J.); *Klein v. Fed. Ins. Co.*, 2012 WL 2886679 (N.D. Tex. July 16, 2012) (Fitzwater, C.J.); *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D. Tex. 2010) (Fitzwater, C.J.); *Klein v. O'Neal, Inc.*, 2009 WL 3573849 (N.D. Tex. Oct. 30, 2009) (Fitzwater, C.J.); *Klein v. O'Neal, Inc.*, 222 F.R.D. 564 (N.D. Tex. 2004) (Buchmeyer, J.).

[2]Because both parties move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[3]In 1997 Revco merged with CVS Corporation and the new corporation was named CVS Revco D.S., Inc. ("CVS Revco").  *Klein V*, 2014 WL 239652, at *1 n.3.  After a subsequent merger, the corporation's name changed to CVS Caremark Corporation ("CVS Caremark").

Inc. ("Carter-Glogau"),[4] alleging claims for negligence, strict liability, and negligent misrepresentation. *Id.*

Defendant Federal issued Revco an excess liability policy ("Federal Policy") for the policy period June 1, 1983 to June 1, 1984. The Federal Policy follows certain terms and provisions of Transit Casualty Company Policy No. UMB 950304 ("Transit Policy"). Under the Transit Policy, coverage is provided for personal injury caused by an "Occurrence," which the Transit Policy defines as "an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the stand-point of the INSURED." Ps. 3/14/16 App. 71.

The Federal Policy lists Revco as the "Named Insured" and, in addition, insures "all subsidiary, affiliated, associated or allied companies [or] corporations[.]" *Id.* at 64. Although the Federal Policy insures both Revco and its wholly owned subsidiary, Carter-Glogau, these corporations were considered separate insureds under the Federal Policy. *Id.* at 72 (Transit Policy) ("Severability of Interest: The term "INSURED" is used severally and not collectively except with respect to [certain insuring agreements and conditions]."); *id.* at 136 (testimony of Federal's corporate representative agreeing that the Federal Policy has separation of insureds clause).

---

[4]In December 1986 certain assets of Carter-Glogau were sold, including the use of the name "Carter-Glogau Laboratories, Inc." The class plaintiffs allege that the liabilities, including the liability for E-Ferol claims, remained with the corporate entity, which was then renamed Retrac, Inc. ("Retrac").

During the pendency of this class action, Federal filed suit in the Northern District of Ohio ("Ohio Action") against CVS Revco D.S., Inc. ("CVS Revco"), seeking a declaratory judgment that Federal had no duty under the Federal Policy to defend or indemnify Revco or CVS Revco in the E-Ferol class action. The Ohio Action was eventually transferred to this court, and, under the terms of an October 7, 2009 "Non-Waiver Agreement" ("NWA"), was consolidated with the certified E-Ferol class action pending in this court ("Consolidated Declaratory Judgment Actions"). *Klein V*, 2014 WL 239652, at *1.[5]

On October 7, 2009, the same day the NWA was executed, the E-Ferol Class entered into a Settlement Agreement and Release ("Settlement Agreement") with Retrac, Inc. ("Retrac"), among others, resolving the claims between the parties concerning the manufacture and distribution of E-Ferol. The settlement was funded by liability insurance from the class action defendants' excess coverage insurance carriers. Federal, however, did not participate in funding the class settlement.[6] It disputed that it had a duty to indemnify its insureds (Carter-Glogau and Revco) for the class plaintiffs' claims. Retrac and CVS Revco

---

[5]On June 5, 2009 the class plaintiffs filed their second amended complaint, in which they named Federal and another insurance company as defendants. They asserted a declaratory judgment claim against Federal, seeking, *inter alia*, a declaration that Federal is required by the terms of the Federal Policy "to indemnify CVS for any liability for injury or death resulting from E-Ferol." 2d Am. Compl. at 34.

[6]Two other excess insurers—International Insurance Co., a/k/a Westchester Fire Insurance Co., n/k/a ACE USA, Inc. ("Westchester") and Mission Insurance Co. ("Mission")—did not participate in funding the class action settlement. The class plaintiffs have settled or dismissed their claims, however, against all defendants other than Federal. *See Klein V*, 2014 WL 239652, at *2 n.7.

therefore agreed under the Settlement Agreement,

> subject to the [NWA] with Federal, [to] assign to the E-Ferol class, by and through its Class Representatives: i) all of their rights, if any, to seek indemnity coverage from Federal . . . for the claims asserted against them in the Class Action; and ii) all of their rights, if any, to seek attorney's fees and costs if prevailing in coverage action against Federal[.]

Ps. 4/12/16 App. 554.

Under the NWA, executed concurrently with the Settlement Agreement, Federal agreed to deposit the $15 million limits of the Federal Policy into an interest bearing escrow account to be disbursed either to Federal or to the E-Ferol Class after a final judgment in the Consolidated Declaratory Judgment Actions.[7]  The NWA provides that the E-Ferol Class is not required to "establish liability or damages in an adversarial trial or to obtain a judgment or for the Defendants to pay a judgment as a condition of proving 'coverage' or prevailing on 'coverage' issues in order to obtain the funds held in escrow pursuant to the terms of [the NWA]."  Ps. 3/14/16 App. 93.

On April 9, 2010 the court approved the class settlement.  *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D. Tex. 2010) (Fitzwater, C.J.) ("*Klein III*").  On April 13, 2011, under the terms of the Settlement Agreement and NWA, CVS Revco and Retrac executed an assignment that purported to assign to the class plaintiffs all of their rights to seek indemnity coverage against Federal and the other non-settling insurers.

---

[7]The NWA also provides a third option, not at issue here, under which a portion of the $15 million would be distributed to the E-Ferol Class.

- 5 -

In their fifth amended complaint, the class plaintiffs seek a judgment declaring that the Federal Policy covers the liability and damages allegations by the class plaintiffs, and that Federal, among others, must indemnify the class plaintiffs, as assignees of Carter-Glogau (now Retrac) and Revco, to the full extent of the $110 million settlement, as set out in the Settlement Agreement.  They also seek to recover damages and attorney's fees.

Federal and the class plaintiffs have each filed a motion for summary judgment, and the court has heard oral argument.

II

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party does so, the opposing party must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) ( per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if the opposing party fails to meet this burden.  *Little*, 37 F.3d at 1076.

When a party moves for summary judgment on a claim on which it will have the burden of proof at trial, however, it "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the moving party must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law.  *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

## III

The court turns first to the class plaintiffs' motion for summary judgment, which presents the question whether the Federal Policy provides coverage based on Revco's negligent supervision of its subsidiary, Carter-Glogau (now Retrac), in the manufacturing and marketing of E-Ferol.

## A

Under both Texas and Ohio law,[8] the insured has the burden of proving coverage

---

[8]Although the court decides below that Ohio law controls with respect to the class plaintiffs' claim for attorney's fees, the court need not resolve the choice-of-law question for purposes of the class plaintiffs' coverage claim because the law regarding the allocation of burdens of proof in the insurance coverage context is the same in Ohio and Texas.

under an insurance policy. *See Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001) ("The insured bears the initial burden of showing that the claim against her is potentially within the insurance policy's scope of coverage." (citations omitted) (Texas law)); *Chi. Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999) ("One who seeks to recover on an insurance policy generally has the burden of demonstrating coverage under the policy and then proving a loss." (citation omitted)).  But when an insurer denies liability coverage based on a policy exclusion, the insurer must plead the policy exclusion as an affirmative defense and must demonstrate that the exclusion applies.  Tex. Ins. Code Ann. § 554.002 (West 2009) ("Language of exclusion in the contract or an exception to coverage claimed by the insurer . . . constitutes an avoidance or an affirmative defense."); *Cont'l Ins. Co. v. Louis Marx & Co.*, 415 N.E.2d 315, 317 (Ohio 1980) ("[A] defense based on an exception or exclusion in an insurance policy is an affirmative one, and the burden is cast on the insurer to establish it.").

The Transit Policy, as to which the Federal Policy follows form, provides insurance coverage for "PERSONAL INJURY. . . caused by an OCCURRENCE, as hereinafter defined."  Ps. 3/14/16 App. 69.  As noted above, the term "OCCURRENCE" is defined as "an accident or event including continuous repeated exposure to conditions, which results, during the policy period, in PERSONAL INJURY or PROPERTY DAMAGE neither expected nor intended from the stand-point of the INSURED."  *Id.* at 71.  The court will assume *arguendo* that the question whether the insured expected or intended the E-Ferol Class's injuries is a question of insurance coverage for which the class plaintiffs bear the

burden of proof.

B

The class plaintiffs contend that Revco and Carter-Glogau are separate insureds under the Federal Policy; that Federal's corporate representative [Steven Jakubowski] agreed that the Federal Policy has a separation of insureds clause; that Revco was unaware of the development, manufacture, and distribution of E-Ferol until the day before the product was recalled[9]; that Revco's negligent failure to use ordinary care to oversee, monitor, and supervise Carter-Glogau proximately caused the class plaintiffs' injuries; and that, under the separation of insureds clause, Federal not only insures Revco and Carter-Glogau as if each was covered by a separate insurance policy, but Federal cannot impute the acts of one to the other by virtue of their having been insured by the same policy.  In other words, the class plaintiffs maintain that they are entitled to coverage under the Federal Policy as a result of *Revco*'s negligence alone, and that any intentional conduct on the part of Carter-Glogau does not impede Federal's obligation to cover Revco's liability.

In response, Federal does not dispute that Revco and Carter-Glogau were separately insured under the Federal Policy[10] or that Revco's conduct in relation to the development,

---

[9]At oral argument, Federal disputed that Revco knew only on the eve of the recall about the drug E-Ferol, arguing that Carter-Glogau notified Revco's claims department of the Spokane adverse reaction report in January 1984.  Federal does not contend, however, that Revco's conduct, either before or after it allegedly received the Spokane report in January 1984, amounted to more than negligence.

[10]*See* Hrg. Tr. 36 ("[W]e acknowledge that [Revco and Carter-Glogau] were separate insureds.").

- 9 -

manufacture, and distribution of E-Ferol was negligent.  It relies instead on language in the Settlement Agreement to contend that the class plaintiffs' agreement to dismiss their claims against Revco and CVS Revco and to release these defendants without any liability precludes the class plaintiffs from seeking coverage under the Federal Policy based on Revco's negligent acts.  Federal contends that "CVS has nothing for which to seek insurance coverage and Class Plaintiffs cannot use the Separation of Insureds provision to avoid their burden to establish that Carter-Glogau is entitled to coverage under the Federal Policy," because the NWA states that Federal is agreeing to participate "in funding the Class Settlement"; the Federal Policy provides that Federal will indemnify the insured for "all sums which the insured shall be obligated to pay *by reason of liability imposed upon the insured* by law or *liability assumed by the insured* under contract or agreement for damages and expenses"; and CVS Revco and Revco were dismissed and released from liability and are not responsible for paying any portion of the class settlement.  D. 4/12/16 Br. 31-32 (emphasis added).

The class plaintiffs argue in reply that Federal has improperly quoted the Settlement Agreement and that the release of CVS Revco was "subject to" the assignment of all of Revco's rights against Federal as set out in the NWA and in Sections X.A. and X.B of the Settlement Agreement.  The class plaintiffs contend that "[t]he release of Revco D.S., Inc. and its successors, CVS Revco D.S., Inc. and CVS Caremark, Inc. was subject to the assignment to the class plaintiffs of all of their rights to indemnity under the Federal [P]olicy *before they were released*."  Ps. 5/3/16 Reply 5 (emphasis added).

- 10 -

C

The Transit Policy contains a "Severability of Interest" clause that states "[t]he term 'INSURED' is used severally and not collectively except with respect to [certain insuring agreements and conditions]." Ps. 3/13/16 App. 72. Under Texas and Ohio law,

> when an insurance policy has a separation of insureds or severability of interests clause, each insured against whom a claim is brought is treated as if it was the only insured under the policy. The intent of the severability clause is to provide each insured with separate coverage, as if each were separately insured with a distinct policy, subject to the liability limits of the policy. The severability clause serves to provide coverage when there is an "innocent" insured who did not commit the conduct excluded by the policy. In *Walker* [*v. Lumbermens Mutual Casualty Co.*, 491 S.W.2d 696 (Tex. Civ. App. 1973, no writ)], for example, [an insurance coverage dispute in which the insurance policy contained an exclusion for intentional harm caused by the insured as well as a severability clause,] the court of appeals held that an exclusion that denied coverage for intentional acts of "the insured" did not apply to the father of the son who committed the intentional acts; therefore, the father was not denied coverage under the insurance policy.

*Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 210 (Tex. App. 2003, pet. denied) (citations omitted); *see also State Farm Fire & Cas. Ins. Co. v. Keegan*, 209 F.3d 767, 769 (5th Cir. 2000) ("a severability clause serves to provide coverage in a situation . . . where there exists an 'innocent' insured who did not commit the conduct excluded under the policy."); *Liberty Mut. Ins. Co. v. Evans*, 1994 WL 184032, at *2 (Ohio Ct. App. 1974) ("A clause in a liability insurance policy providing for severability of interests requires that the term 'the insured' be construed severally and not collectively. This has the effect of considering additional insureds as if separately covered by a policy of their own." (citation

- 11 -

omitted)); *cf. Safeco Ins. Co. of Am. v. White*, 913 N.E.2d 426, 436 (Ohio 2009) ("[W]e hold that insurance-policy exclusions that preclude coverage for injuries expected or intended by an insured, or injuries arising out of or caused by an insured's intentional or illegal acts, do not preclude coverage for the negligent actions of other insureds under the same policy that are predicated on the commission of those intentional or illegal acts, e.g., negligent hiring or negligent supervision.").

The class plaintiffs maintain, and Federal does not dispute, that the legal effect of the severability of interest clause in the Transit Policy is that the allegedly intentional conduct of Carter-Glogau cannot be imputed to Revco.  Accordingly, the class plaintiffs can establish coverage under the Federal Policy based on the negligent conduct of Revco alone; they are not also required to establish coverage for Carter-Glogau's conduct.

## D

The class plaintiffs point out, and Federal does not dispute, that

> (1) there is a separation of insured clause in the Federal/Transit policies as admitted by its corporate representative; (2) that Revco was negligent in its supervision of Carter, which was a proximate cause of the injury suffered by class plaintiffs; and (3) that under the separation of insured clause, the determination of whether Carter-Glogau committed an intentional tort or not has no bearing on the fact that Federal must cover the liability of Revco separately.

Ps. 5/3/16 Reply 3 (citations omitted); *see also* Hrg. Tr. 36 (acknowledging that Revco and Carter-Glogau are separate insureds under the Federal Policy).  Federal essentially argues in response that the class plaintiffs cannot prove coverage under the Federal Policy based on

the conduct of Revco because Revco was dismissed and released from the class action by the Settlement Agreement, and, as a result, was not obligated to pay any portion of the class settlement. Federal's argument lacks force for several reasons.

1

The court begins with Settlement Agreement, which is a contract that provides that it is to be interpreted according to Texas law. *See* Ps. 4/12/16 App. 559.

> Under Texas law, the court's primary concern when interpreting a contract is to ascertain the parties' intentions as expressed objectively in the contract. In doing so, the court must examine and consider the entire writing in an effort to harmonize and give effect to all contractual provisions, so that none will be rendered meaningless. Language should be given its plain and grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated. Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous, and the court will construe it as a matter of law.

*Keith v. J.D. Byrider Sys., LLC*, 2015 WL 3539555, at *6 (N.D. Tex. June 5, 2015) (Fitzwater, J.) (citations omitted).

2

The Settlement Agreement provides in Section IX:

> Representative Plaintiffs agree that CVS Revco D.S., Inc., because it is the successor corporation to Revco D.S., Inc., has no liability with respect to any claims filed in the Klein Action; therefore, they will dismiss CVS Revco, D.S. Inc. from this suit with prejudice upon the Effective Date of this Agreement, *subject to the Non-Waiver Agreement entered into with Federal* and Section X.A. and Section X.B. below. Accordingly, neither CVS Revco D.S., Inc. nor any of its predecessors or successors-in-interest, including, without limitation, CVS Caremark

- 13 -

> Corporation will, or are obligated to contribute, to the
> Settlement Proceeds, nor will they execute this Agreement.

Ps. 4/12/16 App. 554 (emphasis added).  CVS Revco's dismissal is thus "subject to" both the

NWA and the assignment of rights in Section X.A. of the Settlement Agreement, which

provides:

> Retrac and CVS Revco, D.S. Inc. agree they will, subject to the
> Non-Waiver Agreement with Federal, assign to the E-Ferol
> Class, by and through its Class Representatives: i) all of their
> rights, if any, to seek indemnity coverage from Federal . . . for
> the claims asserted against them in the Class Action; and ii) all
> of their rights, if any, to seek attorney's fees and costs if
> prevailing in coverage action against Federal[.]

*Id.*  The NWA, which CVS Caremark signed as "successor to Revco D.S., Inc.," similarly

provides that the "CVS Class Defendants," defined to include Retrac *and* CVS Revco:

> hereby assign to the E-Ferol Class, by and through its Class
> Representatives: i) all of their rights, if any, under the Federal
> Policy to seek indemnity coverage, limited to the Escrow
> Payment, for the claims asserted against them in the Class
> Action; and ii) all of their rights, if any, under the Federal Policy
> or applicable law to seek attorney's fees and costs if prevailing
> in the Consolidated Declaratory Judgment Actions.

Ps. 3/14/16 App. 93.

Considering the Settlement Agreement in its entirety and with a view toward

discerning the intent of the parties as expressed in the agreement, it is clear that the dismissal

of CVS Revco was *subject to* the assignment to the E-Ferol class of CVS Revco's right to

seek indemnity under the Federal Policy.  *See* Ps. 4/12/16 App. 554.  In addition, "Retrac,"

which the Settlement Agreement defines to include Revco,[11] the Named Insured under the Federal Policy, also clearly assigned to the E-Ferol class its right to seek indemnity coverage from Federal. *Id.* Once these rights were assigned to the E-Ferol Class, CVS Revco could be dismissed from the class action, and the class plaintiffs would retain the right to pursue any indemnity coverage to which either CVS Revco or its predecessor, Revco, was entitled under the Federal Policy.

The NWA supports this same conclusion. Not only does the NWA, which CVS Caremark and Retrac both signed, recite the same assignment of rights by Retrac and CVS Revco, but it expressly refers in ¶ 9 to "the claim tendered by CVS Revco D.S., Inc. or Retrac for coverage under the Federal Policy for claims asserted against them in the Class Action as of the date of [the NWA]." Ps. 3/14/16 App. 94. If the parties had intended the Settlement Agreement's dismissal of CVS Revco to preclude the class plaintiffs from pursuing indemnity under the Federal Policy based on their claim against CVS Revco, there would have been no reason to include the language in ¶ 9 of the NWA referring to "the claim tendered by CVS Revco D.S., Inc." *Id.*

Federal contends that, under the Settlement Agreement, the "Class Plaintiffs agreed to dismiss their claims against CVS Revco D.S., Inc. and Revco D.S., Inc. and release them without any liability." D. 4/12/16 Br. 31. Federal's reading of the Settlement Agreement is

---

[11]*See* Ps. 4/12/16 App. 541 ("'Retrac' means Retrac, Inc. and its Related Parties including, without limitation, Carter-Glogau Laboratories, Inc. and its Related Parties and its former parent, Revco D.S., Inc.").

mistaken. The Settlement Agreement clearly distinguishes between Revco and CVS Revco, stating that

> CVS Revco D.S., Inc., *because it is the successor corporation to Revco D.S.*, has no liability with respect to any claims filed in the Klein Action; therefore they will dismiss CVS Revco, D.S Inc. from this suit with prejudice upon the Effective Date of this Agreement, subject to the [NWA] entered into with Federal and Section X.A. and Section X.B. below.

Ps. 4/12/16 App. 554 (emphasis added). This language does not address the liability of *Revco*, the Named Insured under the Federal Policy.

Nor is the court persuaded by Federal's argument that, because "CVS, which Class Plaintiffs have dismissed and released, has no . . . responsibility to pay any portion of the Class settlement or any other amounts to Class Plaintiffs," "CVS has nothing for which to seek insurance coverage and Class Plaintiffs cannot use the Separation of Insureds provision to avoid their burden to establish that Carter-Glogau is entitled to coverage under the Federal Policy." Ds. 4/12/16 Br. 32. This contention fails because *none* of the defendants in the original class action had any responsibility to pay any portion of the Class Settlement. The Settlement Agreement clearly provides that the $110 million settlement is to be funded entirely by the parties' insurance companies. *See* Ps. 4/12/16 App. 547. Accordingly, language in the Settlement Agreement that provides that neither CVS Revco nor its predecessors will be obligated to contribute to the Settlement Proceeds merely memorializes the unremarkable fact that the insurers, not their insureds (including CVS Revco, Revco, Retrac, and the other related entities) will fund the settlement.

Finally, when the court considers the overall intent of the NWA and Settlement Agreement, it is persuaded that none of the parties signing these agreements contemplated that the NWA or Settlement Agreement would operate as a relinquishment of any right to pursue the indemnity claims of Revco and Carter-Glogau in the Consolidated Declaratory Judgment Actions.   As the court explained in its opinion approving the class action settlement:

> Two insurers of defendant Retrac, Inc. ("Retrac")—Federal Insurance Company ("Federal") and Westchester Fire Insurance Company ("Westchester")—whose coverages together represent approximately $17.5 million of the proceeds of the proposed settlement, have not agreed to the Settlement Agreement.  They also dispute that they have a duty to indemnify Retrac for the class plaintiffs' claims.  *Resolution of these coverage questions remains outstanding.*  The court dismissed an attempt by the class plaintiffs to sue Federal and Westchester directly for the purpose of establishing that they have a duty to indemnify Retrac for claims brought by the class . . . .

> A substantial majority of defendants' relevant insurers, representing $90 million of the proposed settlement, have agreed to the Settlement Agreement.   The unresolved nature of Federal's and Westchester's liabilities, along with [Mission Insurance Company's ("Mission's")] insolvency, mean that the total settlement amount is not certain, although it would in any case be between $90 million and $110 million.  *If the Settlement Agreement is approved, defendants will assign to the class their respective rights of indemnification against Federal, Westchester, and Mission.*

*Klein III*, 705 F.Supp.2d at 642 (emphasis added).

Accordingly, the court concludes that, under the express terms of the NWA and Settlement Agreement, CVS Revco assigned to the class plaintiffs its right to seek indemnity

- 17 -

from Federal *as a condition* of its being dismissed from the class action.   Neither the dismissal of CVS Revco from the lawsuit nor the statement in the Settlement Agreement that CVS Revco has "no liability with respect to any claims filed in the Klein Action" affects the class plaintiffs' right to seek indemnity from Federal based on their negligence claim against Revco (now CVS Revco).   Ps. 4/12/16 App. 554.

3

The class plaintiffs have established, and Federal does not dispute, that the Transit Policy has a severability of interest clause; that, as a result of this clause, the allegedly intentional conduct of Carter-Glogau cannot be imputed to Revco; that Revco must be treated as being separately insured from Carter-Glogau; and that Revco's conduct in connection with the manufacturing and marketing of E-Ferol was negligent and proximately resulted in the injuries claimed by the E-Ferol class.[12]   Accordingly, the class plaintiffs have established beyond peradventure and as a matter of law that the Federal Policy covers the negligent

---

[12]Although the class plaintiffs cite extensive evidence that they contend establishes that Revco's negligent supervision of Carter-Glogau (its wholly owned subsidiary) was a proximate and/or producing cause of injury and death to E-Ferol recipients, the class plaintiffs are not required to prove Revco's liability to recover the $15 million held in escrow under the NWA. *See* Ps. 3/14/16 App. 93 (providing that the E-Ferol class is not required "in order to obtain the funds held in escrow pursuant to this paragraph, to establish liability or damages in an adversarial trial or to obtain a judgment or for the Defendants to pay a judgment as a condition of proving 'coverage' or prevailing on 'coverage' issues in order to obtain the funds held in escrow pursuant to the terms of [the NWA].").   Accordingly, to recover the $15 million held in escrow, the class plaintiffs are only required to establish that the Federal Policy covers the conduct of Revco and that there are no genuine issues of material fact regarding policy exclusions or defenses to coverage that would prevent Revco from recovering under the Federal Policy.

conduct of Revco.

## IV

Although the court concludes that the class plaintiffs have met their burden of establishing coverage under the Federal Policy, they are not entitled to summary judgment on their claim to the $15 million held in escrow under the terms of the NWA unless they also establish that they are entitled to summary judgment as to Federal's affirmative defenses. The class plaintiffs move for summary judgment on each remaining affirmative defense.[13] The court will address each in turn, beginning with Federal's second defense (Federal's first defense is addressed to ¶¶ 1-72 of the class plaintiffs' fifth amended original complaint; it is not an affirmative defense).

## A

Federal asserts judicial estoppel and waiver as its second affirmative defense. The class plaintiffs point to the absence of evidence that would create a genuine issue of material fact on these defenses, and they maintain that Federal "failed to disclose the factual basis for this pleading in discovery." Ps. 3/14/16 Br. 28. Federal responds that the class plaintiffs have continually asserted that Carter-Glogau acted intentionally, or, at the very least, expected injury, and that they should be judicially estopped from asserting that the injuries

---

[13]In *Klein v. Federal Insurance Co.*, 2014 WL 4476556 (N.D. Tex. Sept. 11, 2014) (Fitzwater, C.J.), the court granted the class plaintiffs' motion to strike several of Federal's affirmative defenses, but it granted Federal leave to replead. In Federal's second amended answer and affirmative defenses to the class plaintiffs' fifth amended original complaint, Federal pleads ten affirmative defenses. The parties have stipulated that Federal is waiving its third and fourth affirmative defenses.

were not expected or intended.

The court need not address the affirmative defense of judicial estoppel because this defense relates solely to *Carter-Glogau's* intent or expectation regarding the class plaintiffs' injuries.

Regarding waiver, Federal pleads "the doctrine of waiver based on Class Plaintiffs' waiver of all claims other than those retained pursuant to the terms of the [NWA]." 2d Am. Ans. ¶ 73. The court has addressed the question of waiver above and has concluded that, because CVS Revco assigned its rights under the Federal Policy to the class plaintiffs pursuant to the Settlement Agreement and NWA, the class plaintiffs have not waived their claim for indemnity under the Federal Policy based on the negligent conduct of Revco.

Accordingly, the class plaintiffs are entitled to summary judgment on this affirmative defense to the extent they seek to recover the $15 million held in escrow pursuant to the NWA based on the negligent conduct of Revco.

B

Federal's fifth and seventh affirmative defenses relate to whether the class plaintiffs' injuries were expected or intended. The class plaintiffs move for summary judgment contending, *inter alia*, that "Federal has neither pled nor can it prove that Revco even knew of the manufacture of E-Ferol prior to its recall," Ps. 3/14/16 Br. 33, and that the class plaintiffs are entitled to summary judgment on these defenses as to Revco and are entitled to judgment as a matter of law as the assignees of Revco under the NWA. In response, Federal argues extensively that *Carter-Glogau* intended or expected the class plaintiffs'

injuries, but it does not dispute that *Revco* did not expect or intend the class plaintiffs' injuries.

Accordingly, the court grants the class plaintiffs' motion for summary judgment on these affirmative defenses to the extent the class plaintiffs seek to recover the $15 million held in escrow pursuant to the NWA based on the negligent conduct of Revco.

## C

Federal pleads as it sixth affirmative defense:

> The Federal Policy contains limits of liability per occurrence and in the aggregate and/or in the event of other insurance.  In the event that Federal is found to have any liability to indemnify Plaintiffs, the amount of coverage is restricted to said limits in accordance with the terms of the Federal Policy or incorporated therein by reference and/or are in excess of other insurance.

2d Am. Ans. ¶ 77.  The class plaintiffs move for summary judgment on this defense, contending that there is no evidence that creates a genuine dispute as to any violation of the limits of liability, aggregate limits, or other insurance, as claimed by Federal.  Federal does not respond to this argument.

Accordingly, because Federal has failed to create a genuine issue of material fact on its sixth affirmative defense, the court grants the class plaintiffs' motion for summary judgment on this defense.

## D

Federal alleges as its eighth affirmative defense that the class plaintiffs' claims are barred to the extent they seek coverage for medical monitoring costs because, under the

- 21 -

unambiguous and express provisions of the Transit Policy, Federal has no duty to pay medical monitoring costs for the underlying claims.

1

The class plaintiffs move for summary judgment on this affirmative defense, contending that individuals in "Category Four"[14] of the Settlement Agreement, although described as a "medical monitoring group," were injured "at the cellular level" as a result of the administration of E-Ferol, Ps. 3/14/16 Br. 42, and cite the testimony of Robert Brown, M.D., who testified at the class certification hearing that all E-Ferol recipients received a foreign substance that should not have been injected into their bodies, all recipients suffered injuries depending on the dose of E-Ferol received, and "every single dose of E-Ferol caused the death of liver and kidney cells, such that each recipient of E-Ferol was damaged at the cellular level." *id.* at 19. The class plaintiffs explain that class members in Category Four received a set sum of compensation that is not dependant on any future injury, but was instead intended to compensate them for the negligent invasion of their bodies with E-Ferol and the resulting damage at the cellular level. Finally, the class plaintiffs maintain that Federal's corporate representative admitted (1) that a toxic substance injected into an infant would be considered bodily injury covered by the Federal Policy, and (2) that a class member

---

[14]The Settlement Agreement contains five categories of class members. Category Four, "Other Claims," includes: "(a) the claimants identified in Exhibit 4 who allege bodily injury or seek compensation but who do not otherwise fall within Categories One through Three, including claimants who seek damages for medical monitoring, and (b) any Class Member who is reclassified into Category Four pursuant to Section III.B. below." Ps. 4/12/16 App. 544.

awarded a set sum of money, not dependent upon any future event, is not medical monitoring recovery and would be covered by the Federal Policy.

Federal responds by citing the Settlement Agreement, which describes class members in Category Four as including claimants "who allege bodily injury or seek compensation but who do not otherwise fall within Categories One through Three, including claimants who seek damages for medical monitoring." Ps. 4/12/16 App. 544. Federal contends that the medical monitoring claims, by definition, seek compensation for expenses incurred in connection with a possible diagnosis of a potential future injury, sickness, or disease, and that medical monitoring is not encompassed within the plain meaning of "PERSONAL INJURY," as defined by the Transit Policy. Federal relies on two cases—a decision by an Arizona court of appeals and a decision by the Tenth Circuit—to argue that exposure to a toxic substance does not constitute a "bodily injury," as required under the Federal Policy.

In reply, the class plaintiffs contend that, because Federal has failed to refute the evidence that all E-Ferol recipients were injured at the cellular level, there was no award made to the class plaintiffs based on any showing of future injury or future medical testing for any category of class recipient (all were awarded a set monetary settlement), and Federal's representative agreed that these injuries are covered by the Federal Policy, Federal has failed to carry its burden on this affirmative defense.

2

Under Texas and Ohio law, courts interpret policies of insurance according to the rules of contract interpretation. *See, e.g., Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th

Cir. 2005) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)); *Motorists Ins. Cos. v. BFI Waste Mgmt.*, 728 N.E.2d 31, 36 (Ohio Ct. App. 1999) ("The relations between the parties to a contract of insurance being contractual, the rules governing the construction and interpretation of contracts generally apply in construing a policy of insurance."); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts.").  When a "contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law." *Int'l Ins. Co.*, 426 F.3d at 291; *see also Westfield Ins. Co. v. Galatis,* 797 N.E.2d 1256, 1261 (Ohio 2003) ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.  As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." (citations omitted)); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy." *Int'l Ins. Co.*, 426 F.3d at 291; *see also Westfield Ins. Co.*, 797 N.E.2d at 1261("When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement (citing cases)); *Forbau*, 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent.").  The court must give effect to all of a policy's provisions so that none is rendered meaningless.  *Int'l Ins. Co.*, 426 F.3d at 291.  In addition, courts "look to the plain and ordinary meaning of the language used in the policy unless another

meaning is clearly apparent from the contents of the policy." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007).

"Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Int'l Ins. Co.*, 426 F.3d at 291 (citing *Kelley-Coppedge*, 980 S.W.2d at 464); *Westfield Ins. Co.,* 797 N.E.2d at 1261.  If an insurance contract "is susceptible to more than one reasonable interpretation, [the court] will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (footnotes omitted); *see also Westfield Ins. Co.*, 797 N.E.2d at 1262 ("In the insurance context, the insurer customarily drafts the contract. Thus, an ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured." (citations omitted)).

3

The Federal Policy defines "Personal Injury" as "bodily injury, sickness, disease, disability or shock, including death at any time resulting therefrom, mental anguish, mental injury."  D. 3/15/16 App. 309.  The class plaintiffs maintain that the term "bodily injury" includes injury at the cellular level, and cite evidence that every single class member, including the members in Category Four, was injured "at the cellular level," as a result of having received E-Ferol.  In response, Federal does not dispute the class plaintiffs' evidence that Category Four class members were injured "at the cellular level"; instead, it contends that this type of injury, without any physical manifestation of disease, does not constitute

"bodily injury," as that term is used in the Federal Policy.

The term "bodily injury" is not defined by the Federal or Transit Policy.  Because the term is not ambiguous on its face, the court interprets it according to its ordinary meaning. *See, e.g. Cincinnati Ins. Co.*, 875 N.E.2d at 34.  According to Black's Law Dictionary, "bodily injury" means "physical damage to a person's body."  Black's Law Dictionary (10th ed. 2014).  Federal does not dispute the class plaintiffs' evidence that every recipient of E-Ferol sustained damages to his or her kidney and liver cells.  And cells are undisputably part of a person's body.

Courts interpreting policy provisions similar to those in the Federal Policy have concluded, in various contexts, that the term "bodily injury" in a policy of insurance includes injury at the cellular level.  *See, e.g., Voicestream Wireless Corp. v. Fed. Ins. Co.*, 112 Fed. Appx. 553, 555-56 (9th Cir. 2004) (unpublished mem. opinion) (noting that "logic dictates that it is sufficient to allege injury to human cells. . . .  The policy provisions do not explicitly *exclude* coverage for allegations of injury to human cells, and to construe cellular harm as insufficient would be to, in effect, read an additional exclusion into the policy"); *N. Ins. Co. of N.Y. v. Balt. Bus. Commc'ns., Inc.*, 68 Fed. Appx. 414, 419 (4th Cir. 2003) (holding that, "in alleging that persons using cell phones without headsets suffer from the radiation emitted by such phones, the Complaint alleges a 'bodily injury,' " and noting that "Maryland courts have uniformly held that bodily injuries include those that occur at the minute, cellular level"); *Guar. Nat'l Ins. Co. v. Azrock Indus., Inc.*, 211 F.3d 239, 245, 250 (5th Cir. 2000) (concluding that "the subclinical tissue damage that results on inhalation of a toxic substance

- 26 -

such as asbestos" triggered duty to defend and remanding for determination of whether pleadings alleged that exposure caused bodily injury, "even if the particular asbestos-related disease was not diagnosed until sometime after the policy expired."); *overruled on other grounds as recognized by OneBeacon Ins. Co. v. Don's Bldg. Supply Inc.*, 553 F.3d 901, 903 (5th Cir. 2008) (per curiam); *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1047 (D.C. Cir. 1981) ("bodily injury" means "any part of the single injurious process that asbestos-related diseases entail"); *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 657 F.2d 814, 816 (6th Cir. 1981) (holding that insurance coverage was triggered at exposure because "bodily injury" in form of tissue damage occurred at or shortly after inhalation of asbestos fibers); *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 656 A.2d 779, 785-86 (Md. Ct. App. 1995) (holding that exposure to lead resulting in "direct and indirect damage to cells, tissues, and organs" was sufficient to allege "bodily injury"); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 506 (Penn. 1993) (agreeing with conclusion "that the medical evidence of discrete cellular injuries occurring upon exposure to asbestos justifies the conclusion that exposure to asbestos causes immediate 'bodily injury' in the terms of the insurance policies, triggering the insurers' duty to indemnify."); *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 493 (Tex. 2008) (holding that coverage for "bodily injury" extended to alleged biological injury to human cells caused by radio frequency radiation from cellular telephones); *but cf. Eagle-Picher Indus. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 19 (1st Cir. 1982) (holding that injury must manifest to trigger coverage); *Transamerica Ins. Co. v. Doe*, 840 P.2d 288, 291 (Ariz. Ct. App. 1992) (concluding that plaintiffs exposed to HIV-

infected blood who failed to offer "competent evidence of any physical impairment or harm caused by this exposure" did not sustain "bodily injury" under insurance policy).

Federal has presented no persuasive argument why injury to human cells should not constitute "bodily injury" under the Federal and Transit Policies. Nor does Federal point to any language in the Transit or Federal Policy that explicitly *excludes* coverage for allegations of injury to human cells. As Ninth Circuit explained in *Voicestream Wireless Corp.*, where "[t]he policy provisions do not explicitly *exclude* coverage for allegations of injury to human cells, . . . to construe cellular harm as insufficient would be to, in effect, read an additional exclusion into the policy." *Voicestream Wireless Corp.*, 112 Fed. Appx at 556. The class plaintiffs have adduced evidence, which Federal does not dispute, that "every single dose of E-Ferol caused the death of liver and kidney cells, such that each recipient of E-Ferol was damaged at the cellular level." Ps. 3/14/16 Br. 19. The court concludes that the cellular damage that each E-Ferol recipient experienced constituted "bodily injury" under the Federal Policy, much like the subclinical injuries alleged by plaintiffs who have been exposed to asbestos. *See Guar. Nat'l Ins. Co.*, 211 F.3d at 245. Accordingly, because Federal has not adduced any evidence that class members in Category Four did *not* experience damage at the cellular level, the court grants the class plaintiffs' motion for summary judgment as to Federal's eighth affirmative defense.

E

Federal alleges as its ninth affirmative defense that the class plaintiffs' claims are barred to the extent they seek coverage for products failing to meet warranties or

representations.

The class plaintiffs move for summary judgment on this defense, contending, *inter alia*, that they have made no such claim, but instead base their claims on theories of negligence and product liability.  Federal responds that, "[c]ontrary to Class Plaintiffs' assertions, their claims against Retrac (Carter-Glogau) included breach of expressed warranties and breach of implied warranties," D. 4/12/16 Br. 35; that it is undisputed that E-Ferol failed to live up to the representations included in its packaging and that personal injury resulted from that failure; and that because the Federal Policy does not cover personal injury resulting from the failure of E-Ferol to meet the level of performance, quality, fitness, or durability warranted or represented by the insured, the claims against Federal should be dismissed.

The Transit Policy excludes coverage for personal injury arising from "the failure of the INSURED'S products . . . to meet the level of performance, quality, fitness or durability warranted or represented by the INSURED."  Ps. 3/14/16 App. 70.  Even assuming the second amended complaint—the operative complaint at the time the parties executed the Settlement Agreement and NWA—alleged warranty claims that would be excluded from coverage under the Federal Policy, there is no allegation that *Revco* made any warranty or representation regarding E-Ferol.  Because, based on the negligent conduct of Revco alone, the class plaintiffs are entitled to recover the $15 million held in escrow pursuant to the NWA, any allegations that Carter-Glogau made warranties or representations that resulted in injury to the class plaintiffs are immaterial.  Accordingly, to the extent the class plaintiffs

seek to recover the $15 million held in escrow pursuant to the NWA based on the negligent conduct of Revco, the court grants their motion for summary judgment on Federal's ninth affirmative defense.

F

Federal's tenth affirmative defense alleges that plaintiffs' claims are barred because, when Carter-Glogau sold its assets and working capital to C-Acquisition, Co. Inc. ("C-Acquisition") on December 18, 1986, "Retrac transferred and no longer has the right to claim coverage under the Federal Policy."  2d Am. Ans. ¶ 94.  The class plaintiffs move for summary judgment on this defense, contending, *inter alia*, that the only assets transferred in the December 1986 Asset Purchase Agreement ("Asset Purchase Agreement") are those belonging to Carter-Glogau, and that Carter-Glogau never owned the Federal Policy, which was purchased and owned by the Named Insured, Revco.

Federal argues in response, that under the plain language of the Asset Purchase Agreement, Carter-Glogau sold all of its rights under the Federal Policy.  But Federal does not dispute that Revco owned the Federal Policy.  *See* D. 4/12/16 Br. 39.  Thus even if Carter-Glogau transferred to C-Acquisition whatever rights *it* had in the Federal Policy, there is no evidence—nor does Federal argue—that *Revco* transferred its rights under the Federal Policy when C-Acquisition acquired Carter-Glogau's assets and working capital. Accordingly, to the extent the class plaintiffs seek to recover the $15 million held in escrow based on the negligent conduct of Revco, the court grants their motion for summary judgment on Federal's tenth affirmative defense.

G

In sum, the court grants the class plaintiffs' motion for summary judgment on all of Federal's affirmative defenses. Because the class plaintiffs have established beyond peradventure that the Federal Policy covers their negligence claims against Revco, as the named insured, and because the court concludes that, insofar as the class plaintiffs seek indemnity based on their claims against Revco, the class plaintiffs are entitled to summary judgment on each of Federal's affirmative defenses, the court concludes that the class plaintiffs are entitled to recover the $15 million held in escrow pursuant to the terms of the NWA, plus any accrued interest.[15]

V

The class plaintiffs move for summary judgment on their claim for attorney's fees, contending that such fees are recoverable under the Texas Recovery of Attorney's Fees Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, *et seq.*, because they are the prevailing party in a contract dispute regarding both the Federal Policy and the NWA.[16] Federal maintains

_____

[15]Because the court concludes that the class plaintiffs have established beyond peradventure that their claims against Revco are covered under the Federal Policy, the court need not address Federal's motion for summary judgment on the question of coverage. Similarly, because the court concludes that Federal has failed to create a genuine issue of material fact on any of its affirmative defenses, the court need not address Federal's motion for summary judgment on its affirmative defenses.

[16]Tex. Civ. Prac. & Rem. Code Ann. § 38.001 provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." The Supreme Court of Texas has awarded attorney's fees under § 38.001 on a suit for breach of an insurance policy. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 667 (Tex. 1987).

that Ohio, not Texas, law applies to this contract dispute and that Ohio law does not provide for the recovery of attorney's fees for breach of contract, including claims under an insurance contract.

## A

To determine whether the class plaintiffs are entitled to an award of attorney's fees, the court must first decide whether Texas or Ohio law governs.

### 1

Federal contends that because this action was originally filed as a declaratory judgment action in the Northern District of Ohio, this court must apply Ohio choice-of-law rules to determine which state's law governs this dispute. It maintains that Ohio follows the Restatement (Second) of Conflict of Laws, which utilizes a multi-factored "most significant relationship" test to determine the applicable law. Federal posits that, to the extent Ohio and Texas law conflict, application of the Restatement factors demonstrates that Ohio substantive law applies, and, in any event, the class plaintiffs are collaterally estopped from arguing that Texas law applies because the court in *Revco D.S., Inc. v. Government Employees Insurance Co.*, 791 F. Supp. 1254 (N.D. Ohio 1991) ("*GEICO*"), *aff'd*, 968 F.2d 1216 (6th Cir. 1992), already determined that Ohio law applied to the interpretation of the policies issued to Revco and implicated by the E-Ferol litigation.

The class plaintiffs respond that Texas substantive law should apply to the underlying coverage dispute. They contend that *GEICO* is distinguishable because the court in that case did not apply the Restatement factors; the dispute in that case "did not involve, as it does

here, determining whether the Federal liability insurance policy applies to wrongful death and personal injury and damages resulting from the use of E-Ferol," Ps. 4/12/16 Br. 8; and "the 'essence' of the E-Ferol class action is the recovery of damages for personal injury and death due to negligence and product liability, issues that [were] not before the *GEICO* court," *id.* at 9. The class plaintiffs then argue that the Restatement factors point to the application of Texas law: the remaining dispute concerns whether Federal's excess insurance coverage applies to a tort action brought, without objection as to venue, in the state of Texas; Federal's original pleading raised defenses to coverage, several of which were based solely on the class action settlement itself and the presentation of the case before the federal district court in Texas; Texas law applies to the compensatory damages in the underlying case and Texas law regarding personal injury, death, and other damage considerations was used in determining damages in the class action settlement; Texas has a strong statutory interest in regulating insurance contracts that are payable to a citizen or inhabitant of the state of Texas arising from any insurance company that does business in Texas; Texas has statutory and regulatory interests in seeing that its inhabitants are properly compensated for injuries due to negligence and defective products; Texas has "a significant interest in the application of the federal district court's decision in apportioning damages in a complex nationwide class action so that damages may be certain, predictable, uniform, and consistent with the court's rulings that have applied to other insurers of these same claims, as well as to class members," *id.* at 11; Federal's position on "allocation" and "limits of liability" of damages affects the entire class settlement, which was approved by this court; and Federal's claims of exclusion require

interpretation of the NWA, which must be decided under Texas law.  Finally, the class plaintiffs contend that the law applicable to the interpretation of the definition of "OCCURRENCE" is the same under Texas and Ohio law, and, accordingly, because the laws of the states do not conflict, no choice-of-law analysis is necessary, and the court should apply forum law.

In reply, Federal contends that, because this is an insurance coverage dispute (not a tort action), the court should focus on the factors listed in Restatement (Second) of Conflict of Laws § 188, including the place of formulation, negotiation, and performance of the contract; the location of the subject matter of the contract; and the domicile, place of incorporation, and business of the parties, and that these Restatement factors weigh in favor of applying Ohio law.  Federal also challenges the class plaintiffs' assertion that this court applied Texas substantive law to the underlying E-Ferol claims; contends that the considerations in this case (including the parties' positions) are the same as in *GEICO*, and that the class plaintiffs, who are standing in the shoes of Carter-Glogau (a party in the *GEICO* case), are estopped from arguing that Texas law applies; and argues that although it disputes whether it must provide insurance coverage for Carter-Glogau's obligations under the Settlement Agreement, it does not challenge the court's approval of the Settlement Agreement itself.  Finally, Federal contends that a choice-of-law analysis is necessary because Texas and Ohio law conflict on the standard to be used for inferred intent, whether the Federal Policy's exclusion for breach of representations and warranties bars recovery, whether there is coverage for medical monitoring costs, and whether the class plaintiffs are

entitled to recover attorney's fees.

2

"Under any choice-of-law analysis, the Court must first determine whether apparently conflicting laws actually conflict.  If no conflict exists, the Court need not conduct a choice-of-law analysis."  *Janvey v. Alguire*, 2013 WL 2451738, at *1 (N.D. Tex. Jan. 22, 2013) (Godbey, J.) (citing cases).  Here, it is clear that the laws of Texas and Ohio conflict with regard to the availability of attorney's fees to the prevailing party in a breach of contract action.

In a contract dispute, absent the existence of a choice-of-law provision in the contract, courts in Texas and Ohio both "consider the facts of the case under the 'most significant relationship' test set forth in section 188 of the *Restatement (Second) of Conflicts of Laws*." *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-36 (Tex. 1997); *see also Humbert v. United Ohio Ins. Co.*, 798 N.E.2d 25, 27 (Ohio Ct. App. 2003) ("Absent an effective choice of law by the parties, pursuant to Section 188 of the Restatement, the parties' rights and duties under the contract are determined by the law of the state that has 'the most significant relationship to the transaction and the parties.'" (quoting *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio 2001))).[17]

---

[17]Because Texas and Ohio both follow the Restatement in deciding which state's law applies to a contract dispute, the court need not resolve the question whether it must apply Texas's choice-of-law rules (the state where the court sits) or Ohio's choice-of-law rules (the state where Federal's declaratory judgment action was initially filed).  *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("We conclude, therefore, that in cases such as the present, where the defendants seek transfer, the transferee district court must be obligated to

- 35 -

> In the absence of an effective choice of law by the parties . . . , the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.  These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 188(2) (1971).  The court "must also evaluate these contacts in the context of certain policy factors listed in section 6 of the *Restatement*."

*Minn. Mining & Mfg.*, 953 S.W.2d at 736.  These principles include:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and

---

apply the state law that would have been applied if there had been no change of venue.  A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms.").

- 36 -

> (g) ease in the determination and application of the law to be
> applied.

*Id.* (quoting Restatement (Second) of Conflict of Laws § 6(2) (1971)).  "Once these contacts

are established, the question of which . . . law will apply is one of law."  *Duncan v. Cessna*

*Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984) (citing *Gutierrez v. Collins*, 583 S.W.2d 312,

319 (Tex. 1979)).

3

The only contract the class plaintiffs allege Federal has *breached* is the Federal

Policy.[18]  Accordingly, the relevant contacts for purposes of the court's choice-of-law

analysis are those that relate to the Federal Policy.

Federal maintains, and the class plaintiffs do not dispute, that Ohio is both the place

of contracting and of negotiating the Federal Policy.  It is also undisputed that, during the

relevant policy period (1983 and 1984), the place of incorporation and place of business of

Revco, one of the two parties to the Federal Policy, was Ohio.[19]  The remaining contacts (the

place of performance and the location of the contract's subject matter) do not weigh in favor

of Ohio or Texas since the place of performance and location of the contract's subject matter

---

[18]The court denies the class plaintiffs' motion for summary judgment to the extent
they contend they are entitled to attorney's fees as the prevailing parties in a contract dispute
regarding the NWA.  Although the court has relied on language in the NWA in deciding
certain legal issues in this case, there is no allegation in the fifth amended original complaint
that Federal in any way breached the NWA.  Rather, the only contract dispute that could
possibly form the basis for an award of attorney's fees is based on the Federal Policy.

[19]Federal—the other party to the Federal Policy—was at the time of contracting a New
Jersey corporation with its principal place of business in New Jersey.

could have been any state in which Revco and Carter-Glogau did business, and there is no indication that either the place of performance or the location of the contract's subject matter weighs more heavily in favor of either Texas or Ohio law.

The court next considers the § 6 factors. "Policy analysis is difficult in this case because few of these § 6 factors guide [the court] in a discernable way." *Robax Corp. v. Prof'l. Parks, Inc.*, 2008 WL 3244150, at *10 (N.D. Tex. Aug. 8, 2008) (Fitzwater, C.J.) (brackets and citations omitted). The court concludes, however, that the third and fourth factors—the relative interests of other interested states in the determination of the particular issue and the protection of justified expectations—weigh slightly in favor of Ohio law. The Federal Policy is a policy of insurance negotiated and entered into in the state of Ohio with a company headquartered there. Ohio certainly has a stronger interest in the interpretation and resolution of coverage issues with respect to an insurance policy entered into in Ohio with a company located in Ohio than does Texas. Texas' connection to the Federal Policy is through the class plaintiffs in a nationwide class action, whose rights under the policy arose as the result of an assignment pursuant to the Settlement Agreement. This more attenuated connection does not outweigh Ohio's interest in the determination of the issues raised in this coverage dispute.[20] Moreover, while both Federal and Revco might reasonably

---

[20]The class plaintiffs also contend that Texas has a strong statutory interest in regulating insurance contracts that are payable to a citizen or inhabitant of the state of Texas arising from any insurance company that does business in Texas. But the class plaintiffs have not shown—nor do they argue in any detail—that Federal does business in Texas. Moreover, although the two class representatives are residents of Texas, they represent a nationwide class.

have expected Ohio law to govern the Federal Policy, there is no suggestion anywhere in the summary judgment record that any party to the Federal Policy would have expected Texas law to govern questions regarding coverage. None of the other § 6 factors—perhaps with the exception of the last factor (the ease in the determination and application of the law to be applied)[21]—weighs strongly favor of applying Texas law. Considering all of the relevant Restatement factors, the court concludes that Ohio law applies to the instant coverage dispute.

4

The class plaintiffs contend that the Restatement factors point to the application of Texas law because Texas law regarding personal injury and death and other damage considerations was used to determine damages in the class action settlement; the court has already applied Texas substantive law to E-Ferol wrongful death claims in this case, and

> [t]he states of New Jersey, Indiana, Rhode Island, and Ohio have no interest whatsoever in whether an excess liability insurance policy issued in 1983-84 applies to an on-going thirteen-year federal court class action filed in Texas in 2003, with a $110 million settlement approved by the district court in 2010, after numerous pre-trial hearings, and memorandum opinions leading up to and following approval, and after disbursement of settlement proceeds from the defendants' other insurers.

---

[21]The class plaintiffs argue that ease in the determination and application of the law to be applied "is a major consideration in resolving choice of law questions under Section 6 of the *Restatement*." Ps. 3/14/16 Br. 9. But they do not demonstrate why this court would have any difficulty in applying Ohio law to the instant coverage dispute. Nor could they: on the substantive issues the court addresses above, Ohio and Texas law do not conflict, and with respect to the question of recovery of attorney's fees, it is not difficult to apply Ohio law and conclude that such fees are not recoverable.

Ps. 3/14/16 Br. 8.  The court is unpersuaded by these arguments for two reasons.

First, the class plaintiffs focus on factors that may be relevant if this were a *tort action*.  *See, e.g.* Restatement (Second) of Conflicts of Laws §§ 145 & 146 (in a tort action, presumption that the law of the place of the injury controls unless another jurisdiction has more significant relationship, and listing factors to evaluate in deciding choice of law in a tort action).  But the instant coverage dispute is not a tort action; essentially, it is a contract dispute.  *See, e.g. Ohayon*, 747 N.E.2d at 211 (for purposes of choice of law analysis, "an action by an insured against his or her insurance carrier for payment of . . . benefits is a cause of action sounding in contract, rather than tort, even though it is tortious conduct that triggers applicable contractual provisions.").  Factors such as the substantive law the parties relied on in calculating damages in connection with the Settlement Agreement or the location of the district court that approved the Settlement Agreement have little or no bearing on whether Texas or Ohio law should apply to the insurance dispute between Federal (a New Jersey corporation) and its insured (an Ohio corporation) regarding a policy of insurance with nationwide application that was entered into in Ohio.

Second, by relying on this court's role in certifying the class action and approving the Settlement Agreement as a justification for applying Texas substantive law to the instant insurance coverage dispute, the class plaintiffs are attempting to impermissibly bootstrap the application of Texas law based on factors wholly unrelated to the contacts relevant to the

court's choice-of-law analysis.[22]  The *only* contacts with Texas in this case arose as a result of this litigation.  It cannot be the case that, by filing a nationwide class action in Texas, plaintiffs can thereby become entitled to an award of attorney's fees under Texas law when all of the relevant contacts for purposes of the court's choice-of-law analysis point to the law of a state (here, Ohio) that does not permit attorney's fees.  In other words, the class plaintiffs' reliance on *procedural* events that occurred in this litigation, and that post-date the Federal Policy by many years, to argue that Texas *substantive* law should apply to a contract with virtually no connection to the state of Texas is misplaced.[23]

Accordingly, the court concludes as a matter of law that Ohio law governs the class plaintiffs' claim for attorney's fees.

B

The class plaintiffs seek attorney's fees only under Texas law.  They neither seek attorney's fees under Ohio law nor dispute Federal's contention that they are not entitled to an award of attorney's fees under Ohio law.  *See B-T Dissolution, Inc. v. Provident Life & Accident Ins. Co.*, 192 Fed Appx. 444, 447 (6th Cir. 2006) (unpublished opinion) (holding

---

[22]The class plaintiffs' argument that "Texas also has a significant interest in the application of the federal district court's decision in apportioning damages in a complex nationwide class action so that damages may be certain, predictable, uniform, and consistent with the court's rulings that have applied to other insurers of these same claims, as well as to class members in the various categories to which each has been assigned by the court approved [Settlement Agreement]" fails for these same reasons.  Ps. 3/14/16 Br. 10.

[23]Because the court concludes that Ohio law governs the class plaintiffs' insurance coverage claim, the court does not address whether the class plaintiffs are collaterally estopped, by the decision in *GEICO*, from arguing that Texas law applies.

under Ohio law that "insured is not entitled to recover attorney fees when it is successful in a suit against its insurance company for payments under the terms of the policy, absent a finding of bad faith in the denial of coverage."); *Avis Rent A Car Sys., LLC v. City of Dayton*, 2015 WL 5636897, at *11 (S.D. Ohio Sept. 25, 2015) ("[I]t is clear that Ohio courts have allowed a prevailing party to recover its attorneys' fees in breach of contract actions *where the breaching party's conduct amounted to bad faith*." (emphasis added)); *Strategy Grp. for Media, Inc. v. Lowden*, 2013 WL 1343614, at *11 (Ohio Ct. App. Mar. 21, 2013) ("Ohio follows the American rule which provides in a breach of contract case each party is responsible for their own attorney fees except as otherwise provided for by statute or contract or when the opposing party acted in bad faith, vexatiously, wantonly, obdurately, for malicious reasons, or otherwise engaged in malicious conduct.").[24]  Accordingly, the court concludes as a matter of law that the class plaintiffs are not entitled to an award of attorney's fees from Federal.  It therefore denies the class plaintiffs' motion for summary judgment on the question whether they are entitled to reasonable attorney's fees, and it grants Federal's motion for summary judgment on this same question.

## C

Although the class plaintiffs are not entitled to an award of attorney's fees from Federal, their attorneys may be entitled to recover attorney's fees and expenses from the

---

[24]The class plaintiffs do not allege that Federal acted in bad faith, and they waived in the NWA any claim "for bad faith or extra-contractual liability damages against Federal arising from Federal's acts or omissions in connection with E-Ferol claims."  Ps. 3/14/16 App. 94.

common fund.  In *Klein III* in approving class counsel's request for an attorney's fee award equaling 30% of the class recovery, the court stated that, "if class counsel succeeds in obtaining additional insurance recoveries through litigation against Federal, Westchester, or Mission following the approval of the Settlement Agreement, counsel can apply for an additional fee award."  *Klein III*, 705 F.Supp.2d at 681 n.44.  Accordingly, if counsel for the class plaintiffs intend to seek an award of additional attorney's fees and expenses from the common fund, they must apply for such an award within 28 days of the date this memorandum opinion and order is filed.

\*   \*   \*

The court grants the class plaintiffs' motion for summary judgment to the extent of holding that the Federal Policy covers the negligent conduct of Revco in connection with the manufacture and distribution of E-Ferol, and that the class plaintiffs are entitled to the $15 million held in the court registry, plus accrued interest.  The court denies the class plaintiffs' motion for summary judgment to the extent they seek attorney's fees from Federal, and it grants Federal's motion for summary judgment on the issue of attorney's fees.  The court otherwise denies Federal's motion for summary judgment.  By Rule 54(b) final judgment entered today, the court enters judgment in favor of the class plaintiffs, except as to their claim for attorney's fees from Federal.  The class plaintiffs may apply for an award of attorney's fees from the common fund within 28 days of the date this memorandum opinion

and order is filed.

**SO ORDERED**.

December 2, 2016.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE